# FISHER ET AL. *v.* CITY OF BERKELEY, CALIFORNIA, ET AL.

No. 84–1538.   Argued November 12, 1985—Decided February 26, 1986

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR,

JJ., joined. POWELL, J., filed an opinion concurring in the judgment, *post*, p. 270. BRENNAN, J., filed a dissenting opinion, *post*, p. 274.

*Jon D. Smock* argued the cause for appellants. On the briefs were *James R. Parrinello, John E. Mueller*, and *Peter J. Donnici.*

*Laurence H. Tribe* argued the cause for appellees. With him on the brief were *Kathleen M. Sullivan, Myron Moskovitz*, and *Manuela Albuquerque.**

JUSTICE MARSHALL delivered the opinion of the Court.

The question presented here is whether a rent control ordinance enacted by a municipality pursuant to popular initiative is unconstitutional because pre-empted by the Sherman Act.

I

In June 1980, the electorate of the city of Berkeley, California, enacted an initiative entitled "Ordinance 5261-N. S., Rent Stabilization and Eviction for Good Cause Ordinance"

---

*Briefs of *amici curiae* urging reversal were filed for the California Housing Council, Inc., by *Carla A. Hills* and *William C. Kelly, Jr.;* for the Mid-America Legal Foundation by *John M. Cannon, Susan W. Wanat*, and *Ann Plunkett Sheldon;* for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *Robert K. Best;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey Department of the Public Advocate by *Richard E. Shapiro;* and for the United States Conference of Mayors et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Stephen Chapple*, and *Cynthia M. Pols.*

Briefs of *amici curiae* were filed for the City and County of San Francisco by *George P. Agnost* and *Burk E. Delventhal;* for the City of Santa Monica et al. by *Robert M. Myers, Stephen S. Stark, Karl M. Manheim, Raymond E. Ott*, and *K. D. Lyders;* for the Berkeley Property Owners' Association by *Thomas A. Seaton;* for the California Apartment Association by *Jon D. Smock, Wilbur H. Haines III*, and *Jeffrey J. Gale;* for the Coalition for Competition in Apartment Rentals by *E. Barrett Prettyman, Jr.*, and *Elwood S. Kendrick;* and for the National Apartment Association et al. by *Jon D. Smock.*

(hereafter Ordinance). Section 3 of the Ordinance stated the measure's purposes:[1]

> "The purposes of this Ordinance are to regulate residential rent increases in the City of Berkeley and to protect tenants from unwarranted rent increases and arbitrary, discriminatory, or retaliatory evictions, in order to help maintain the diversity of the Berkeley community and to ensure compliance with legal obligations relating to the rental of housing. This legislation is designed to address the City of Berkeley's housing crisis, preserve the public peace, health and safety, and advance the housing policies of the City with regard to low and fixed income persons, minorities, students, handicapped, and the aged." App. to Juris. Statement A–111.

To accomplish these goals, the Ordinance places strict rent controls on all real property that "is being rented or is available for rent for residential use in whole or in part," § 5, *id.,* at A–113. Excepted are government-owned units, transient units, cooperatives, hospitals, certain small owner-occupied buildings, and all newly constructed buildings. For the remaining units, numbering approximately 23,000, 37 Cal. 3d 644, 678, 693 P. 2d 261, 288 (1984), the Ordinance establishes a base rent ceiling reflecting the rents in effect at the end of May 1980. A landlord may raise his rents from these levels only pursuant to an annual general adjustment of rent ceilings by a Rent Stabilization Board of appointed commissioners or after he is successful in petitioning the Board for an individual adjustment. A landlord who fails to register with the Board units covered by the Ordinance or who fails to ad-

---

[1] In 1982, while this case was pending in the California Court of Appeal, the Berkeley electorate enacted the "Tenants' Rights Amendments Act of 1982," revising certain sections of the 1980 Ordinance. Like the California Supreme Court, we review the Ordinance as amended, see 37 Cal. 3d 644, 654, n. 2, 693 P. 2d 261, 270, n. 2 (1984); all reference herein will therefore be to the 1982 version of the Ordinance.

here to the maximum allowable rent set under the Ordinance may be fined by the Board, sued by his tenants, or have rent legally withheld from him. If his violations are willful, he may face criminal penalties.

Shortly after the passage of the initiative, appellants, a group of landlords owning rental property in Berkeley, brought this suit in California Superior Court, claiming, *inter alia*, that the Ordinance violates their rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and seeking declaratory and injunctive relief. The Superior Court upheld the Ordinance on its face, but was reversed by the Court of Appeal. While that appeal was pending, however, this Court's decision in *Community Communications Co.* v. *Boulder*, 455 U. S. 40 (1982), led certain *amici* to raise the question whether the Ordinance was unconstitutional because pre-empted by the federal antitrust laws. When the California Supreme Court heard the appeal from the Court of Appeal's decision, it therefore chose to consider plaintiffs' pre-emption claim along with their Fourteenth Amendment challenge.

Although fully briefed on the question whether the Berkeley Ordinance constitutes state action exempt from antitrust scrutiny under the standard established in *Boulder*, *supra*, the California Supreme Court noted that consideration of this issue would become necessary only were there to be "'truly a conflict between the Sherman Act and the challenged regulatory scheme,'" 37 Cal. 3d, at 660, 693 P. 2d, at 275 (quoting *First American Title Co.* v. *South Dakota Land Title Assn.*, 714 F. 2d 1439, 1452 (CA8 1983), cert. denied, 464 U. S. 1042 (1984)). Such a conflict would exist, the Supreme Court concluded, only if the Ordinance on its face mandated conduct prohibited by either § 1 or § 2 of the Sherman Act. See *Rice* v. *Norman Williams Co.*, 458 U. S. 654, 661 (1982). After reviewing the two "traditional standards" that have consistently been used to determine whether conduct violates § 1 of the Sherman Act—the *per se* rules and the rule of reason, see

*National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 692 (1978)—the court concluded that both standards, with their exclusive focus on competition and concern for the selfish motives of private actors, failed to give due deference to a municipality's legitimate interest in promoting public health, safety, and welfare. 37 Cal. 3d, at 667–673, 693 P. 2d, at 280–285. The Supreme Court therefore found both standards inappropriate and proceeded to apply a standard of its own devising, based upon this Court's Commerce Clause cases. Applying this test, the court found no conflict between the Ordinance and either § 1 or § 2 of the Sherman Act.

We noted probable jurisdiction limited to the antitrust pre-emption question, 471 U. S. 1124 (1985), and now affirm, although on grounds different from those relied on by the California Supreme Court. While that court was correct in noting that consideration of state action is not necessary unless an actual conflict with the antitrust laws is established, we find traditional antitrust analysis adequate to resolve the issue presented here.

## II

We begin by noting that appellants make no claim under either § 4 or § 16 of the Clayton Act, 15 U. S. C. §§ 15 and 26, that the process by which the Rent Stabilization Ordinance was passed renders the Ordinance the product of an illegal "contract, combination . . . , or conspiracy." Appellants instead claim that, regardless of the manner of its enactment, the regulatory scheme established by the Ordinance, on its face, conflicts with the Sherman Act and therefore is pre-empted.

Recognizing that the function of government may often be to tamper with free markets, correcting their failures and aiding their victims, this Court noted in *Rice* v. *Norman Williams Co.*, *supra*, that a "state statute is not pre-empted by the federal antitrust laws simply because the state scheme may have an anticompetitive effect," *id.*, at 659. See *Exxon*

*Corp.* v. *Governor of Maryland,* 437 U. S. 117, 133 (1978). We have therefore held that a state statute should be struck down on pre-emption grounds "only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." 458 U. S., at 661.

While *Rice* involved a state statute rather than a municipal ordinance, the rule it established does not distinguish between the two. As in other pre-emption cases, the analysis is the same for the acts of both levels of government. See, *e. g., White* v. *Massachusetts Council of Construction Employers, Inc.,* 460 U. S. 204 (1983). Only where legislation is found to conflict "irreconcilably" with the antitrust laws, *Rice, supra,* at 659, does the level of government responsible for its enactment become important. Legislation that would otherwise be pre-empted under *Rice* may nonetheless survive if it is found to be state action immune from antitrust scrutiny under *Parker* v. *Brown,* 317 U. S. 341 (1943). The ultimate source of that immunity can be only the State, not its subdivisions. See *Community Communications Co.* v. *Boulder, supra,* at 50–51; *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 412–413 (1978) (opinion of BRENNAN, J.).

## A

Appellants argue that Berkeley's Ordinance is pre-empted under *Rice* because it imposes rent ceilings across the entire rental market for residential units. Such a regime, they contend, clearly falls within the *per se* rule against price fixing, a rule that has been one of the settled points of antitrust enforcement since the earliest days of the Sherman Act, see *Arizona* v. *Maricopa County Medical Society,* 457 U. S. 332, 344–348 (1982); *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 218 (1940). That the prices set here are ceilings rather than floors and that the public interest has been invoked to justify this stabilization should not, appellants

argue, save Berkeley's regulatory scheme from condemnation under the *per se* rule.

Certainly there is this much truth to appellants' argument: Had the owners of residential rental property in Berkeley voluntarily banded together to stabilize rents in the city, their activities would not be saved from antitrust attack by claims that they had set reasonable prices out of solicitude for the welfare of their tenants. See *National Society of Professional Engineers* v. *United States, supra,* at 695; *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290 (1897). Moreover, it cannot be denied that Berkeley's Ordinance will affect the residential housing rental market in much the same way as would the philanthropic activities of this hypothetical trade association. What distinguishes the operation of Berkeley's Ordinance from the activities of a benevolent landlords' cartel is not that the Ordinance will necessarily have a different economic effect, but that the rent ceilings imposed by the Ordinance and maintained by the Rent Stabilization Board have been unilaterally imposed by government upon landlords to the exclusion of private control.

The distinction between unilateral and concerted action is critical here. Adhering to the language of § 1, this Court has always limited the reach of that provision to "unreasonable restraints of trade effected by a 'contract, combination . . . , or conspiracy' between *separate* entities." *Copperweld Corp.* v. *Independence Tube Corp.,* 467 U. S. 752, 768 (1984) (emphasis in original). We have therefore deemed it "of considerable importance" that independent activity by a single entity be distinguished from a concerted effort by more than one entity to fix prices or otherwise restrain trade, *Monsanto Co.* v. *Spray-Rite Service Corp.,* 465 U. S. 752, 763 (1984). Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement. *Id.,* at 760–761; *United States* v. *Parke, Davis*

*& Co.*, 362 U. S. 29, 44 (1960). Thus, if the Berkeley Ordinance stabilizes rents without this element of concerted action, the program it establishes cannot run afoul of § 1.

Recognizing this concerted-action requirement, appellants argue that the Ordinance "forms a combination between [the city of Berkeley and its officials], on the one hand, and the property owners on the other. It also creates a horizontal combination among the landlords." Reply Brief for Appellants 10, n. 7. In so arguing, appellants misconstrue the concerted-action requirement of § 1. A restraint imposed unilaterally by government does not become concerted action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy. Similarly, the mere fact that all competing property owners must comply with the same provisions of the Ordinance is not enough to establish a conspiracy among landlords. Under Berkeley's Ordinance, control over the maximum rent levels of every affected residential unit has been unilaterally removed from the owners of those properties and given to the Rent Stabilization Board. While the Board may choose to respond to an individual landlord's petition for a special adjustment of a particular rent ceiling, it may decide not to. There is no meeting of the minds here. See *American Tobacco Co.* v. *United States*, 328 U. S. 781, 810 (1946), quoted in *Monsanto, supra,* at 764. The owners of residential property in Berkeley have no more freedom to resist the city's rent controls than they do to violate any other local ordinance enforced by substantial sanctions.

## B

Not all restraints imposed upon private actors by government units necessarily constitute unilateral action outside the purview of § 1. Certain restraints may be characterized as

"hybrid," in that nonmarket mechanisms merely enforce private marketing decisions. See *Rice* v. *Norman Williams Co.*, 458 U. S., at 665 (STEVENS, J., concurring in judgment). Where private actors are thus granted "a degree of private regulatory power," *id.*, at 666, n. 1, the regulatory scheme may be attacked under § 1. Indeed, this Court has twice found such hybrid restraints to violate the Sherman Act. See *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384 (1951); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980).

In *Schwegmann*, a Louisiana statute authorized a distributor to enforce agreements fixing minimum retail prices not only against parties to such contracts, but also against retailers who sold the distributor's products without having agreed to the price restrictions. After finding that the statute went far beyond the now-repealed Miller-Tydings Act, which offered a limited antitrust exemption to certain "'contracts or agreements prescribing minimum prices for the resale'" of specified commodities, the Court held that two liquor distributors had violated § 1 when they attempted to hold a retailer to the price-fixing terms of a contract it had refused to sign. In so holding, the Court noted that "when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids." 341 U.S, at 389. However, under the Louisiana statute, both the selection of minimum price levels and the exclusive power to enforce those levels were left to the discretion of distributors. While the petitioner-retailer in that case may have been legally required to adhere to the levels so selected, the involvement of his suppliers in setting those prices made it impossible to characterize the regulation as unilateral action by the State of Louisiana.

The trade restraint condemned in *Midcal* entailed a similar degree of free participation by private economic actors. That case presented an antitrust challenge to California's requirement that all wine producers, wholesalers, and rectifi-

ers file fair trade contracts or price schedules with the State. If a wine producer did not set prices, wholesalers had to post a resale price schedule for that producer's brands. No state-licensed wine merchant could sell wine to a retailer at other than those prices. 445 U. S., at 99. The Court found: "California's system for wine pricing plainly constitutes resale price maintainance in violation of the Sherman Act . . . . The wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers." *Id.*, at 103. Here again, the mere existence of legal compulsion did not turn California's scheme into unilateral action by the State. The Court noted: "The State has no direct control over wine prices, and it does not review the reasonableness of the prices set by wine dealers." *Id.*, at 100.

The hybrid restraints condemned in *Schwegmann* and *Midcal* were thus quite different from the pure regulatory scheme imposed by Berkeley's Ordinance. While the Ordinance does give tenants — certainly a group of interested private parties — some power to trigger the enforcement of its provisions, it places complete control over maximum rent levels exclusively in the hands of the Rent Stabilization Board. Not just the controls themselves but also the rent ceilings they mandate have been unilaterally imposed on the landlords by the city.

## C

There may be cases in which what appears to be a state- or municipality-administered price stabilization scheme is really a private price-fixing conspiracy, concealed under a "gauzy cloak of state involvement," *Midcal, supra*, at 106. This might occur even where prices are ostensibly under the absolute control of government officials. However, we have been given no indication that such corruption has tainted the rent controls imposed by Berkeley's Ordinance. Adopted by popular initiative, the Ordinance can hardly be viewed as a cloak for any conspiracy among landlords or between the landlords and the municipality. Berkeley's landlords have

simply been deprived of the power freely to raise their rents. That is why they are here. And that is why their role in the stabilization program does not alter the restraint's unilateral nature.[2]

## III

Because under settled principles of antitrust law, the rent controls established by Berkeley's Ordinance lack the element of concerted action needed before they can be characterized as a *per se* violation of § 1 of the Sherman Act, we cannot say that the Ordinance is facially inconsistent with the federal antitrust laws. See *Rice* v. *Norman Williams Co.*, *supra*, at 661. We therefore need not address whether, even if the controls were to mandate § 1 violations, they would be exempt under the state-action doctrine from antitrust scrutiny. See *Hallie* v. *Eau Claire*, 471 U. S. 34 (1985).

The judgment of the California Supreme Court is

*Affirmed.*

JUSTICE POWELL, concurring in the judgment.

The Court today reaches out to decide a difficult preemption question when a straightforward and well-settled ground for decision is available. In my view, Berkeley's Ordinance plainly falls within the "state action" exemption of *Parker* v. *Brown*, 317 U. S. 341 (1943), and its progeny. I therefore concur in the judgment, but on grounds different from those discussed in the Court's opinion.

---

[2] Though they have not pressed the point with any vigor in this Court, appellants have suggested that Berkeley's rent controls constitute attempted monopolization because the city "is clearly engaged in the provision of housing in the public sector" and using the controls to depress the prices of residential properties as a prelude to taking them over. Tr. of Oral Arg. 14–15. As to this claim, we note only that the inquiry demanded by appellants' allegations goes beyond the scope of the facial challenge presented here. See *Rice* v. *Norman Williams Co.*, 458 U. S., at 661.

When a municipal government engages in anticompetitive activity pursuant to a clearly articulated state policy to displace competition with regulation, the "state action" exemption removes the conduct from the coverage of the antitrust laws. *Hallie* v. *Eau Claire*, 471 U. S. 34, 38–39 (1985); *Community Communications Co.* v. *Boulder*, 455 U. S. 40, 54 (1982). In *Hallie*, we found such a policy embodied in a state statute that "delegated to [municipalities] the express authority to take action that foreseeably will result in anticompetitive effects." 471 U. S., at 43. See also *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 415 (1978) (opinion of BRENNAN, J.) ("[A]n adequate state mandate for anticompetitive activities . . . exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of'") (citation omitted). Thus, the question in this case is whether California has expressly delegated to Berkeley regulatory power that foreseeably would lead to the anticompetitive effects challenged by appellants.

The history of Berkeley's ordinance is illuminating. Prior to 1974, Article XI, § 3, of the California Constitution[1] required the state legislature to approve all changes in municipal charters. In 1972, in a citywide initiative, Berkeley's citizens approved a charter amendment authorizing rent

---

[1] When Berkeley's charter amendment was passed in 1972, Article XI, § 3(a), of the California Constitution read:

"For its own government, a county or city may adopt a charter by majority vote of its electors voting on the question. The charter is effective when filed with the Secretary of State. A charter may be amended, revised, or repealed in the same manner. A charter, amendment, revision, or repeal thereof shall be published in the official state statutes. . . . The provisions of a charter are the law of the State and have the force and effect of legislative enactments."

This provision was construed to require that charter amendments be approved by concurrent resolution of both houses of the state legislature. *Birkenfeld* v. *City of Berkeley*, 17 Cal. 3d 129, 137, n. 2, 550 P. 2d 1001, 1007, n. 2 (1976).

control. This charter amendment effectively froze rents at 1971 levels, subject to individual adjustments by a popularly elected rent control board. *Birkenfeld* v. *City of Berkeley*, 17 Cal. 3d 129, 138, 550 P. 2d 1001, 1008 (1976). The California Legislature ratified the charter amendment on August 2, 1972, and the rent control plan went into effect. 1972 Cal. Stat. 3370. A group of landlords challenged the rent control plan on a number of constitutional and statutory grounds. In the ensuing litigation, the California Supreme Court invalidated the plan on the ground that it lacked procedural safeguards necessary to protect landlords from confiscatory rent ceilings.[2] *Birkenfeld, supra,* at 170–172, 550 P. 2d, at 1030–1032. In 1980, in another initiative, Berkeley's citizens adopted the ordinance at issue in this case. This Ordinance provided the procedural protections that the 1972 charter provision lacked, and it subsequently survived constitutional challenge in state court. 37 Cal. 3d 644, 679–691, 693 P. 2d 261, 289–298 (1984).

The challenged Ordinance thus replaces a rent control plan that was expressly authorized by the state legislature. Under *Hallie,* a general grant of authority to regulate rents would have sufficed to exempt Berkeley's Ordinance from the antitrust laws. 471 U. S., at 42. It follows that the legislature's ratification of a particular rent control plan must also trigger the state-action exemption. See *ibid.; Boulder, supra,* at 55–56. The remaining issue is whether the authority granted in 1972 remains intact.

Appellants contend that it does not. First, appellants argue that the California Supreme Court's decision in *Birken-*

---

[2] The 1972 charter provision permitted individual adjustments of the across-the-board rent ceiling only on a unit-by-unit basis, and only after a hearing on the particular unit whose rent was to be raised. The California Supreme Court found that this limitation "put the [rent control board] in a procedural strait jacket," and "unnecessarily preclude[d] reasonably prompt action" on meritorious petitions by landlords. *Birkenfeld, supra,* at 171, 172, 550 P. 2d, at 1031, 1032.

*feld*, invalidating the 1972 charter provision, effectively canceled the legislature's ratification of that provision. *Birkenfeld* did not, however, decide that rent control was bad policy, or that it was inconsistent with state law. See *Birkenfeld, supra*, at 159–164, 550 P. 2d, at 1023–1026 (finding that enacting a rent control plan was a permissible exercise of the city's police power); Note, 65 Calif. L. Rev. 304, 305 (1977) (*"Birkenfeld* offers California cities . . . the judicial equivalent of a rent control enabling act"). Rather, the decision stands only for the proposition that cities must couple rent control with procedures for adjusting rent ceilings to avoid fixing rents at confiscatory levels. 17 Cal. 3d, at 167–173, 550 P. 2d, at 1028–1033. *Birkenfeld* thus left Berkeley's basic power to impose rent controls unaffected.

Second, appellants contend that since 1972 the state legislature has declared its neutrality respecting a city's decision to control rents. See *Boulder, supra*, at 55 (clear articulation requirement is not satisfied "when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive"). This argument rests on the passage in 1980 of a comprehensive planning and zoning law, one provision of which states:

> "Nothing in this article shall be construed to be a grant of authority *or a repeal of any authority which may exist* of a local government to impose rent controls or restrictions on the sale of real property." Cal. Govt. Code Ann. § 65589(b) (West 1983) (emphasis added).

By its express terms this statute leaves intact cities' pre-existing authority to adopt rent control provisions. For purposes of the clear articulation requirement, Berkeley's pre-existing authority is defined by the legislature's ratification of the city's 1972 charter amendment.

For these reasons, I would find that Berkeley's Ordinance is exempt from the antitrust laws under our decisions in *Hallie* and *Boulder*. By ratifying Berkeley's charter amendment, the state legislature expressly authorized Berkeley to

control rents. The State has not since rescinded that authorization. That is all we need decide in this case.

I therefore concur in the judgment, and express no view on the merits of the pre-emption issue decided by the Court.

JUSTICE BRENNAN, dissenting.

Since *Parker* v. *Brown*, 317 U. S. 341 (1943), the Court has wrestled with the question of the degree to which federal antitrust laws prohibit state and local governments from imposing anticompetitive restraints on trade. Laws which impose such restraints have been held to be exempt from antitrust scrutiny if they constitute action of the State itself in its sovereign capacity, or state-authorized municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy. See *Community Communications Co.* v. *Boulder*, 455 U. S. 40, 52 (1982). Today, the Court holds that a municipality's price-fixing scheme is not pre-empted by the federal antitrust laws whether or not the scheme is state-authorized, or furthers or implements a clearly articulated and affirmatively expressed state policy. Because today's decision discards over 40 years of carefully considered precedent, I respectfully dissent.

I

A

Berkeley's Rent Stabilization Ordinance (hereafter Ordinance) effectively fixes prices for rental units in the city of Berkeley. In *Rice* v. *Norman Williams Co.*, 458 U. S. 654, 661 (1982), we held that a state statute

"may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under § 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a *per se* violation."

In this case, by declaring maximum prices landlords may charge, Berkeley's Ordinance irresistibly pressures landlords to fix prices for their rental units. Thus, the Ordinance "facially conflict[s] with the Sherman Act because it *mandate[s]* [price fixing], an activity that has long been regarded as a *per se* violation of the Sherman Act." *Id.*, at 659–660 (emphasis in original).

The Court recognizes that the Ordinance imposes anticompetitive restraints on trade, and that it has the same effect on the housing market as would a conspiracy by landlords to fix rental prices. *Ante*, at 266. Despite this, the Court holds that the Ordinance is not pre-empted by the Sherman Act because prices are fixed "unilaterally" by the city, rather than by "contract, combination, or conspiracy." I do not read our decisions necessarily to require proof of such concerted action as a prerequisite to a finding of pre-emption. Certainly, nothing we said in *Rice* supports such a narrow view of pre-emption.[1] Our other decisions have found statutes in conflict with the Sherman Act because they eliminated price competition in the relevant market.

In *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), a wine wholesaler sought to enjoin enforcement of a California statute which effectively

---

[1] *Rice* held that a "state statute is not pre-empted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect." 458 U. S., at 659. *Rice* involved a challenge to a California statute which effectively allowed liquor distillers to control distribution of their products in the State. The Court concluded that because such vertical *nonprice* restraints are not *per se* illegal under the Sherman Act, see *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977), the statute was not pre-empted. 458 U. S., at 661; see also *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117 (1978); *Joseph E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35 (1966). In contrast, Berkeley's Rent Stabilization Board fixes prices for rental units in the city. Unlike *nonprice* restraints, *price fixing* has traditionally been held to be *per se* illegal under the Sherman Act. See *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911).

required it to sell wines at prices set by producers. The Court focused on the fact that the statute eliminated price competition, and held that the wine-pricing system constituted resale price maintenance in violation of the Sherman Act. The *Midcal* decision squarely controls the result here. Just as the statute challenged in *Midcal* compelled wine wholesalers to charge prices set by wine producers, Berkeley's Ordinance compels landlords to charge prices set by the city. The city "holds the power to prevent price competition by dictating the prices charged" by landlords. *Id.*, at 103. "[S]uch vertical control destroys horizontal competition as effectively as if [landlords] 'formed a combination and endeavored to establish the same restrictions . . . by agreement with each other.'" *Ibid.* (quoting *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373, 408 (1911)).

*Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384 (1951), is also directly on point. In *Schwegmann*, a Louisiana statute authorized liquor distributors to enforce agreements fixing minimum retail prices on their products against retailers who had not agreed to the price restrictions. The Court held that the statutory scheme amounted to resale price maintenance, in violation of the Sherman Act. To paraphrase the Court in *Schwegmann*, "when [the city] compels [landlords] to follow a parallel price policy, it demands private conduct which the Sherman Act forbids." *Id.*, at 389. "[W]hen [landlords] are *forced* to abandon price competition, they are driven into a compact in violation of the spirit of the proviso which forbids 'horizontal' price fixing." *Ibid.* (emphasis in original).

## B

Even if I accepted the Court's analysis of the antitrust preemption issue, I would find a functional "combination" in this case between the city of Berkeley and its officials, on the one hand, and the landlords on the other—a combination that operates to fix prices for rental units in Berkeley. To reach a contrary result, the Court simply states a conclusion—that

"[a] restraint imposed unilaterally by government does not become concerted action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law." *Ante*, at 267. The Court doesn't explain why this is so—it simply baldly asserts that "[t]he ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy." *Ibid.* The best I can make of this is that the Court apparently would interpret the Sherman Act to forbid only privately arranged price-fixing schemes. See *ante*, at 267–269. That interpretation would be plainly misguided.

Section 1 of the Sherman Act declares illegal restraints of trade resulting from any "contract, combination . . . , or conspiracy." 15 U. S. C. § 1. Understandably, that wording has led the Court to draw a "basic distinction" between concerted and independent action, and to hold that "[i]ndependent action is not proscribed" by § 1. *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984). However, until today we have not held, or indeed even suggested, that government-imposed restraints on economic actions cannot constitute concerted action. Rather, both *Schwegmann* and *Midcal* held that state statutes which "had a coercive effect upon parties who must obey the law" violated § 1.[2]

---

[2] The Court would distinguish *Schwegmann* and *Midcal* based on the role of private parties in setting prices. *Ante*, at 268–269. The Court characterizes the statutory restraints imposed in those cases as "hybrid, in that nonmarket mechanisms merely enforce private marketing decisions." *Ante*, at 267. In this case, the Court argues, Berkeley's landlords have no control over the prices they charge. *Ibid.*

True, in both cases private parties, rather than the State, were largely responsible for setting the prices that retailers had to adhere to. However, the lack of state supervision over price-fixing activities was only relevant to whether the challenged statutes were immune from antitrust liability under *Parker* v. *Brown*, 317 U. S. 341 (1943), see *Midcal*, 445 U. S., at 105; neither decision drew the distinction the Court today creates between "unilateral" and "hybrid" governmental restraints. In both cases the chal-

If the Ordinance allowed the individual landlords ultimately to set their own rental prices, I might understand the Court's conclusion that any resulting price restraints did not necessarily result from collective action. Cf. *Monsanto Co.* v. *Spray-Rite Service Corp.*, *supra*, at 761. However, because the Ordinance has the force of law, the city can compel landlords to do what the Sherman Act plainly forbids—to fix prices for rental units in Berkeley. Regardless of whether the landlords "agree" to the prices charged, the circumstances here clearly "exclude the possibility that the [city and the landlords] were acting independently." 465 U. S., at 764. The Ordinance eliminates price competition more effectively than any private "agreement" ever could, and is therefore pre-empted by the Sherman Act. The Court's contrary conclusion does not further, as it argues, but rather distorts "traditional antitrust analysis." *Ante*, at 264.

## II

Ultimately, the Court is holding that a municipality's authority to protect the public welfare should not be constrained by the Sherman Act. That holding excludes a broad range of local government anticompetitive activities from the reach of the antitrust laws. This flies in the face of the fact that Congress has not enacted such a broad antitrust exemption for municipalities. See *Community Communications Co.* v. *Boulder*, 455 U. S. 40 (1982); *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389 (1978); cf. 15 U. S. C. § 35(a) (1982 ed., Supp. II) (immunizing local governments

---

lenged statute was found invalid simply because it compelled private parties to charge fixed prices for their products, conduct which the Sherman Act forbids. See *Schwegmann*, 341 U. S., at 389; *Midcal*, *supra*, at 103. The Court's "distinction" ignores the fact that price fixing has the same deleterious effect upon the competitive market whether prices are set by an administrative body or by private parties. Thus, regardless of whether Berkeley's landlords have some role in setting the prices they must charge, the coercive effect of the city's Ordinance results in concerted action violative of the Sherman Act.

only from liability for damages for violations of the antitrust laws). "In light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, . . . we [have been] especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach." *Lafayette, supra,* at 412–413 (plurality opinion). "The *Parker* state-action exemption reflects Congress' intention to embody in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under our Constitution. But this principle contains its own limitation: Ours is a '*dual* system of government,' *Parker,* 317 U. S., at 351 (emphasis added), which has no place for sovereign cities." *Community Communications Co.* v. *Boulder, supra,* at 53. Of course, our decisions do not foreclose municipalities from enacting anticompetitive measures in the public interest, but only require that such actions be state-authorized and be implemented pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with regulation or monopoly service. See 455 U. S., at 52. Berkeley's Ordinance plainly is not exempt from antitrust scrutiny under this standard.

Appellees suggest that three considerations support their argument that the Ordinance implements a clearly articulated and affirmatively expressed state policy authorizing municipalities to enact rent control measures: (1) the state legislature's 1972 ratification of a city rent control charter amendment; (2) the California Supreme Court's decision in *Birkenfeld* v. *City of Berkeley,* 17 Cal. 3d 129, 550 P. 2d 1001 (1976), which ultimately invalidated that amendment; and (3) the city's state-law obligation to provide affordable housing. None of these considerations support appellees' position.

First, in 1972, Berkeley adopted a rent control charter amendment, which was approved by concurrent resolution of

both houses of the state legislature.[3]   There are serious doubts that this purely *pro forma* approval would qualify the amendment for the *Parker* exemption.   See *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579 (1976).   In any event, that amendment was subsequently invalidated by the California Supreme Court, and the legislature's actions respecting its passage afford no support for the claimed exemption of the *current* Ordinance from antitrust scrutiny.

Second, the *Birkenfeld* decision, while invalidating Berkeley's rent control amendment, found state authority for such measures in constitutional provisions conferring upon cities the power to "make and enforce . . . all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."   17 Cal. 3d, at 140, 550 P. 2d, at 1009–1010. But we have made clear that such general grants of authority do not constitute the required mandate to engage in conduct that necessarily constitutes a violation of the antitrust laws.   See *Community Communications Co.*, 455 U. S., at 55.   "Acceptance of such a proposition . . . would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require."   *Id.*, at 56.

Third, state law requires cities to "make adequate provision for the housing needs of all economic-segments of the community."   Cal. Govt. Code Ann. § 65580(d) (West 1983). But, although appellees argue that rent control measures are a "foreseeable result" of these statutory obligations, see *Hallie* v. *Eau Claire*, 471 U. S. 34 (1985), those laws are expressly neutral with respect to a city's authority to impose rent controls.   California Govt. Code Ann. § 65589(b) (West 1983) expressly provides that "nothing in this article shall be construed to be a grant of authority or a repeal of any authority which may exist of a local government to impose rent con-

---

[3] At that time, the State Constitution required the legislature to approve city charter amendments.   See *Birkenfeld* v. *City of Berkeley*, 17 Cal. 3d, 129, 137, n. 2, 550 P. 2d, 1001, 1007, n. 2 (1976).   In 1974, the State Constitution was amended to eliminate this requirement.

trols." See also Cal. Health & Safety Code Ann. § 50202 (West Supp. 1986) ("[N]othing in this division shall authorize the imposition of rent regulations or controls"). The requirement of "'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." *Community Communications Co.*, *supra*, at 55 (emphasis in original). Plainly, by that standard the Ordinance does not qualify for the *Parker* exemption from antitrust liability.

## III

Finally, appellees suggest that a finding of pre-emption in this case will severely restrict a municipality's authority to enact a variety of measures in the public interest. "But this argument is simply an attack upon the wisdom of the long-standing congressional commitment to the policy of free markets and open competition embodied in the antitrust laws." *Community Communications Co.*, *supra*, at 56. Congress may ultimately agree with appellees' argument, and may choose to amend the antitrust laws to grant municipalities broad discretion to enact anticompetitive measures in the public interest. Pending such amendment, however, only a clearly articulated and affirmatively expressed state policy will exempt ordinances like this from the reach of the Sherman Act.