In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1883

FLYING J, INCORPORATED,

*Plaintiff-Appellee,*

*v.*

J.B. VAN HOLLEN, Attorney General of Wisconsin,
ROB NILSESTUEN, Secretary of the Wisconsin
Department of Agriculture, Trade and
Consumer Protection,

*Defendants.*

APPEAL OF:

WISCONSIN PETROLEUM MARKETERS &
CONVENIENCE STORE ASSOCIATION,

*Intervenor-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:08-cv-00110—**Rudolph T. Randa**, *Judge.*

ARGUED APRIL 14, 2010—DECIDED SEPTEMBER 3, 2010

Before POSNER, RIPPLE, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge.* Flying J, Inc., brought a facial
challenge to Wisconsin's gasoline pricing regulations. The

district court granted Flying J's motion for summary judgment and permanent injunction against enforcing the provisions, finding that the provisions were preempted by the Sherman Act and not saved by state action immunity. We granted the Wisconsin Petroleum Marketers & Convenience Store Association's motion to intervene after the original Defendants—the state officials charged with enforcing the provisions— declined to appeal the district court's decision. Because we find that the provisions are not preempted by the Sherman Act, the district court's grant of Flying J's motion for summary judgment is reversed, the permanent injunction is dissolved, and the case is remanded to the district court with directions to enter judgment in favor of Defendants.

## I. BACKGROUND

### A. *Wisconsin Unfair Sales Act*

Wisconsin passed the Unfair Sales Act ("Act") in 1939. In its original form, the Act mandated a 3 percent markup at wholesale and a 6 percent markup at retail on all merchandise sold in Wisconsin, including gasoline. The Act remained more or less in its original form until 1986 when the Wisconsin Legislature removed the minimum markup provisions for everything except tobacco, alcoholic beverages, and—most relevant to the case before us—motor vehicle fuel. *See generally Orion Flight Servs., Inc. v. Basler Flight Serv.*, 714 N.W.2d 130, 146-47 (Wis. 2006).

In general, the Act prohibits retailers of motor vehicle fuel from selling the fuel below cost. Wis. Stat. § 100.30(3). The statute carefully defines the "cost to retailer." For a retailer of motor vehicle fuel other than a wholesaler or refiner, cost is the greater of (1) invoice or replacement cost, less certain deductions, plus a 6% markup, or (2) "the average posted terminal price at the terminal located closest to the retailer plus a markup of 9.18%." *Id.* (2)(1m)(c). The "average posted terminal price" is defined as:

> the average posted rack price, as published by a petroleum price reporting service, at which motor vehicle fuel is offered for sale at the close of business on the determination date by all refiners and wholesalers of motor vehicle fuel at a terminal plus any excise, sales or use taxes imposed on the motor vehicle fuel or on its sale, any cost incurred for transportation and any other charges that are not otherwise included in the average posted rack price. In this paragraph, "average" means the arithmetic mean.

*Id.* (2)(a). A terminal is "a motor vehicle fuel storage and distribution facility that is supplied by a pipeline or marine vessel, from which facility motor vehicle fuel may be removed at a rack and from which facility at least 3 refiners or wholesalers of motor vehicle fuel sell motor vehicle fuel." *Id.* (2)(j).

The Act requires similar markups by wholesalers and refiners who sell motor vehicle fuel at retail. *Id.* (2)(1m)(a) (defining a refiner's cost as the greater of

invoice or replacement cost plus a 9.18% markup or the average posted terminal price plus a 9.18% markup); *id*. (2)(1m)(b) (same definition of cost for wholesalers). The Act also includes other minimum markups in the definition of the "cost" of motor vehicle fuel sold at wholesale, *see id.* (2)(c)(1g) & (1r), or other non-retail sales, *see id.* (2)(d) & (e).

The Wisconsin Department of Agriculture, Trade, and Consumer Protection ("DATCP") or a district attorney may sue violators of the Act on behalf of the state to recover specified fines. *Id.* (4). DATCP may also issue cease-and-desist orders for violations, and DATCP or a district attorney may sue to recover fines for violating those orders. *Id.* (5)(a). DATCP or a district attorney may also sue to enjoin violations of the Act. *Id.* (5)(b). The Act also gives a private cause of action to "[a]ny person who is injured or threatened with injury as a result of a sale or purchase of motor vehicle fuel." *Id.* (5m). The aggrieved party may sue for an injunction against the violator or for treble damages, "together with costs, including accounting fees and reasonable attorney fees." *Id.* The private cause of action expires 180 days after the violation occurs. *Id.*

Finally, the Act allows a business selling motor vehicle fuel to charge less than the minimum markup provisions would otherwise require if "[t]he price of merchandise is made in good faith to meet an existing price of a competitor." *Id.* (6)(7). To take advantage of this exception, however, the seller must give notice to DATCP "in the form and the manner required by" DATCP on the

same day that it matches its competitor's price. *Id.* (7)(a). If timely notice is not given, the seller cannot assert as a defense the price-matching exception to the minimum markup provisions. *Id.* (7)(b). The price-matching exception is available to retailers, wholesalers, and refiners. *Id.* (7)(a)-(c).

In another statute, Wisconsin requires anyone selling motor vehicle fuel to post the "net selling price per gallon of all grades of motor fuel and the amount of all taxes per gallon thereon." Wis. Stat. § 100.18(8). The posted prices "shall remain in effect for at least 24 hours after they are posted." *Id.*

From the end of April 2003 through 2008, DATCP received 1541 complaints alleging violations of the minimum markup provisions for motor vehicle fuel. DATCP did not, however, prosecute a single action involving violations of the Act from January 2003 through April 2008. DATCP has promulgated administrative regulations regarding the enforcement of § 100.30, including regulations specifying the form and manner of giving DATCP notice of matching a competitor's price. *See generally* Wis. Admin. Code ch. ATCP 105.

The record in this case includes two reports. The first, conducted by the Federal Trade Commission in 2003, concluded that the Act harmed competition at the expense of Wisconsin consumers by "deter[ing] pro-competitive price-cutting and caus[ing] some vendors to raise their prices." Federal Trade Commission, *Re: Wisconsin's Unfair Sales Act* (Oct. 15, 2003), *available at* http://www.ftc.gov/be/v030015.shtm (last visited Aug. 16,

2010) (the "FTC Report"). The FTC Report also con-cluded that the Wisconsin Act was unnecessary because federal antitrust law was adequate to police the same conduct targeted by the Wisconsin Act. *Id.*

The second report, conducted by the Wisconsin Policy Research Institute in 1999, concluded that "the evidence suggests that the primary result of [the mini-mum markup provisions of the Act] has been to inflate the price of gasoline for Wisconsin consumers and facilitate tacit collusion in retail gasoline markets." James I. Brannon & Frank Kelly, *Pumping Up Gas Prices in Wis-consin: The Effects of the Unfair Sales Act on Retail Gasoline Prices in Wisconsin*, 12 Wis. Policy Research Inst. 7, at 1 (Oct. 1999) (the "WPRI Report"). Although the authors of the WPRI Report argue that "[m]ost of the empirical research done on retail gasoline markets suggests that the primary problem in the market is not predatory pricing, but rather a propensity towards price collusion," there is no evidence in the WPRI Report of any actual collusion in the Wisconsin motor vehicle fuel market. *See id.* 3-4.

## B.  Procedural History

Plaintiff-Appellee Flying J, Inc., is a Utah corporation with its principal place of business in Ogden, Utah. It is a vertically integrated supplier of motor vehicle fuel and maintains that it could sell motor vehicle fuel for sub-stantially less than the statutory minimum and still make a profit. Defendants are J.B. Van Hollen, Attorney General of Wisconsin, and Rod Nilsestuen, Secretary of

DATCP. Flying J sued in federal district court to enjoin Defendants from enforcing the minimum markup provisions of the Act as they relate to motor vehicle fuel, alleging that those provisions are preempted by the Sherman Act. The district court agreed with Flying J, finding that the statute was preempted by the Sherman Act and that it was not saved by state actor immunity. The district court issued a permanent injunction prohibiting Defendants from enforcing the motor vehicle fuel provisions of the Act. *Flying J, Inc. v. J.B. Van Hollen*, 597 F. Supp. 2d 848 (E.D. Wis. 2009). Defendants decided not to file a motion to reconsider or to stay the injunction; they also decided not to appeal the district court's decision.

Intervenor-Appellant Wisconsin Petroleum Marketers and Convenience Store Association ("WPMCA"), a trade association of Wisconsin gasoline dealers, moved the district court to allow WPMCA to intervene, to reconsider its decision, and to stay its injunction. The district court denied WMPCA's motion to intervene, and WMPCA appealed. In our written opinion of August 20, 2009, we vacated the district court's denial of WPMCA's motion to intervene and directed the parties (that is, WMPCA standing in Defendants' shoes on appeal, and Flying J) to submit briefs on the merits.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*. *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 495 (7th Cir. 2010). Summary judgment is appropriate if "there

is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010).

The first question we must address is whether the minimum markup provisions under the Act are preempted by the Sherman Act. To be preempted, the state regulatory scheme must irreconcilably conflict with the federal scheme. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). A hypothetical or theoretical conflict is insufficient to warrant preemption. *Id.* Likewise, "[a] state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect." *Id.* Rather, a statute is preempted "'only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.'" *Fisher v. City of Berkeley, Calif.*, 475 U.S. 260, 265 (1986) (*quoting Rice*, 458 U.S. at 661).

Flying J argues that the motor vehicle fuel provisions of the Act facilitate a "classic horizontal price fixing scheme." (Appellee Br. at 19.) It argues that by establishing a minimum price for gasoline among retailers, allowing competitors to meet but not beat others' prices, and providing a private mechanism for enforcement, Wisconsin has created a scheme that allows retail sellers of gasoline to collude on prices to the detriment of consumers. Of course, horizontal price fixing is *per se* illegal under federal antitrust law, *BCB Anesthesia Care, Ltd. v.*

*Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 666 (7th Cir. 1994), and if the Act required the collusive conduct that Flying J identifies, then we could quickly declare the Act preempted and move on to the next question. But it is only when a state law *mandates* or *authorizes* collusive conduct that it is preempted by federal antitrust law. *See Fisher*, 475 U.S. at 265. On its face, the Act does not mandate or authorize Wisconsin gasoline dealers to engage in conduct that is illegal under the Sherman Act.

The case most analogous to the present one is *Fisher.* In *Fisher*, the City of Berkeley established an ordinance that froze rental rates at their 1980 levels and established a Rent Stabilization Board to control future increases in rental rates. *Id.* at 261-62. The Board decided how much to allow all rents to increase each year and also had discretion to decide whether to allow an individual landlord to increase her rents if she petitioned to do so. *Id.* The ordinance included a number of enforcement mechanisms, including allowing tenants to sue if their landlord charged more than was allowed under the ordinance. *Id.* at 262-63. A group of landlords brought a facial challenge to the ordinance, arguing that the ordinance imposed rent ceilings that constituted price fixing in violation of federal antitrust laws. *Id.* at 265.

The Court agreed that the landlords could not have legally entered into a private agreement to stabilize rental prices, even for benevolent reasons. *Id.* at 266. But the Court found that the ordinance was not preempted because the rent ceilings were "unilaterally imposed by government upon landlords to the exclusion of private

control." *Id.* at 266. The distinction between unilateral government action on one hand and concerted action on the other was dispositive of the question of preemption because "[a] restraint imposed unilaterally by government does not become concerted-action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law." *Id.* at 267.

We can discern no meaningful difference between the unilaterally imposed rent ceilings in *Fisher* and the mandatory markup provisions in Wisconsin. On its face, the Act requires retail sellers of motor vehicle fuel to calculate the minimum price at which they can sell motor vehicle fuel using relatively simple mathematical formulas. The seller calculates its actual costs, subtracts certain items, and adds 6 percent. The seller then goes to the nearest terminal, averages the prices being offered at the terminal, and adds 9.18 percent. The seller then compares the actual cost plus the markup with the estimated cost from the terminal plus the markup—generally, the Act requires the seller to charge no less than the higher of those two numbers. The one exception is that the seller is allowed to charge less in order to match a competitor's advertised price. Sellers must maintain their posted prices for at least 24 hours. The statute neither requires nor authorizes gasoline dealers to get together and agree on what price they will all charge for gasoline. Nor does the statute require or authorize wholesalers to get together to decide what prices they will charge at the terminal. On the face of the statute, there is simply nothing that compels collusive private conduct that would violate the Sherman Act.

To be sure, if gasoline dealers met together and privately agreed on a minimum price that they would all charge, their conduct would be *per se* illegal under federal antitrust law. However, just as in *Fisher*, "[t]he distinction between unilateral and concerted action is critical here." 475 U.S. at 266. The state of Wisconsin sets the minimum price formula, and the Act, on its face, does not require or authorize private participation in setting the minimum price. Thus, we find that the minimum markup provisions are unilaterally imposed by the state and therefore not preempted by the Sherman Act.

The district court found that the Act was a *per se* restraint on trade because "[t]he minimum markup percentage creates a range in which competitors may engage in collusive parallel pricing, which is exacerbated as the wholesale price of gasoline fluctuates." *Flying J*, 597 F. Supp. 2d at 856. First, as noted above, a statute is only preempted if it requires or authorizes collusive conduct. Where a statute does neither, the fact that the parties or the court can envision scenarios under the regulatory scheme in which private parties could more easily collude is insufficient to invalidate the statute. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 131 (1978). And any party that engages in collusive conduct under such a statute would not be able to raise its compliance with the state statute as a defense.

Second, there is simply no evidence in the record that gasoline dealers—wholesalers, retailers, or otherwise—are colluding to fix or raise the price of gasoline in Wisconsin. Although it has avoided calling it so, Flying J's chal-

lenge to the Act is a facial challenge. It is not arguing that the statute is preempted because gasoline dealers in Wisconsin are colluding to raise or fix the price of gasoline. Rather, its challenge is premised on its argument that the statute requires private parties to horizontally fix prices. As discussed above, Flying J is wrong that the statute on its face creates a classic horizontal price-fixing scheme. And the only evidence that it cites in support of its argument that private parties are colluding are the two reports discussed above. Although both concluded that the minimum markup provisions are unnecessary and may in fact be hurting Wisconsin consumers, only the WPRI Report raised the specter of collusion among gasoline dealers, and it did so only in the theoretical sense. *See* WPRI Report, at 3-4. This is simply not enough to support a facial challenge to this statute.

Flying J argues that the Act is a "hybrid" statute that is preempted by federal antitrust law. A hybrid statute is one that gives private parties discretion to set prices that the government then enforces. *See Fisher*, 475 U.S. at 267-68. Hybrid statutes are preempted. *See, e.g.*, *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 389 (1951).

In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, the Supreme Court found that California's wine pricing system was preempted. 445 U.S. 97, 103 (1980). A statute required all producers and wholesalers to submit either fair trade contracts or price schedules to the state. Wine dealers were not allowed to sell wine

at any price other than that set by the fair trade contracts or price schedules. The state played no role in determining the prices of wine. *Id.* at 99-100. The Court found that the California statute "plainly constitute[d] resale price maintenance in violation of the Sherman Act." *Id.* at 103. The Court found decisive the fact that the wine producers could eliminate competition in the wine industry by setting the prices that wholesalers could charge. *Id.*

Similarly, in *324 Liquor Corp. v. Duffy*, the Court found that New York's minimum markup law on liquor was preempted. 479 U.S. 335, 342 (1987). In a statute somewhat similar to Wisconsin's motor vehicle fuel minimum markups, New York prohibited liquor retailers from selling liquor below "cost," which the statute defined as the "posted bottle price" plus a 12% markup. *Id.* at 338-39. In addition to posting the bottle price, wholesalers also posted the case price. Wholesalers had complete discretion to set both the bottle price and the case price. Retailers made their purchases from the wholesalers based on the case price, but had to sell the liquor based on the bottle price. Because the two prices did not have to relate to each other, the wholesalers could lower the case price while maintaining the bottle price, thus allowing the retailers to sell the liquor for more than the required 12% markup over wholesale cost. *Id.* at 349-40. The net effect of the law was "to permit wholesalers to maintain retail prices at artificially high levels." *Id.* at 340. The Court concluded that the law created "a regime of resale price maintenance on all New York liquor retailers" and was thus preempted. *Id.* at 341.

The Court found that New York's regulatory scheme was for all intents and purposes the same as California's regime found to be preempted in *Midcal*. *Id.* at 342. The problem again was that the statute displaced competition but gave private actors discretion to set prices. *Id.* at 345.

Wisconsin's motor vehicle fuel pricing scheme is not a hybrid statute. The California and New York pricing systems in *Midcal* and *324 Liquor* gave complete discretion to private entities to set the prices that the statutes then enforced. The state was not involved in any way in setting or determining the final, enforceable prices. Although New York's scheme involved a minimum markup just like Wisconsin requires for motor vehicle fuel, the unique nature of New York's scheme authorized wholesalers to manipulate the prices to which the markup was applied. *324 Liquor*, 479 U.S. at 348-50. Here, Wisconsin requires a minimum markup to be included in a retailer's "cost," but the statute does not authorize wholesalers to collude or manipulate the terminal prices to which the markup is applied or set the retail prices to be charged.

The fact that Wisconsin has created a private cause of action to enforce its minimum markup provisions does not make the statute a hybrid statute. Because the state itself is mandating the minimum price, the mere fact that interested private parties may enforce the minimum-pricing scheme does not make the Act a hybrid statute. *See Fisher*, 475 U.S. at 269 (finding that a private cause of action in tenants—"certainly a group of inter-

ested private parties"—did not change the unilateral nature of the city ordinance stabilizing rent prices because the city retained complete control over the rent ceiling). The exception to the Wisconsin minimum markup provisions allowing retailers to match its competitor's price is also insufficient alone to make the statute a preempted hybrid statute. The Act authorizes parallel behavior, but it does not authorize retailers to get together and agree on a posted price. "Without more, parallel conduct does not suggest conspiracy . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).

Flying J also argues that the *324 Liquor* Court rejected New York's scheme—that mandated that the minimum markup be applied to the bottle price—because the bottle price "may greatly exceed what the retailer actually paid for the liquor." *324 Liquor*, 479 U.S. at 345 n.6. The Court's comment was made in a footnote during its discussion of whether the New York pricing scheme qualified for state actor immunity. The Court suggested that a "simple minimum markup provision" could satisfy the "active supervision" requirement of state actor immunity, see *Midcal*, 445 U.S. at 105, but found that the New York markup was not a simple markup scheme. *324 Liquor*, 479 U.S. at 345 n.6. The great vice of the New York scheme was not that the markup was applied to a price that did not represent the actual cost to the retailer, but that the wholesalers could sell to the retailers at one price and force the retailers to apply the minimum markup to another. *Id*. Wisconsin's minimum markup provisions at issue here do not suffer from the same vice. Although the 9.18%

markup is applied to an estimate of the retailer's cost based on average terminal prices rather than its actual costs, the scheme does not authorize wholesalers to manipulate wholesale prices of gasoline to guarantee a bigger return to retailers.

We also note that the allegations of price fixing by wholesalers of liquor in *324 Liquor* was more than hypothetical or theoretical. There was evidence in the record of wholesalers advertising that their lowered case prices could guarantee retailers a higher profit than the statutory 12 percent. *324 Liquor*, 479 U.S. at 340. There was also evidence of wholesalers encouraging retailers to buy in bulk when case prices were low. *Id.* There is simply not sufficient evidence in this case's record to support a finding that gasoline dealers are colluding or manipulating gasoline prices in Wisconsin.

The lack of evidence in the record supporting Flying J's allegations of collusive conduct by gasoline dealers is fatal to its claim that the motor vehicle fuel provisions of the Act are preempted by the Sherman Act. We cannot find on the face of the statute any compelled or authorized conduct that constitutes a violation of federal antitrust law. Because we conclude that the Act is not preempted, we need not consider whether the provision would qualify for state action immunity under *Parker v. Brown*, 317 U.S. 341 (1943).

It may well be that gasoline retailers are getting together with each other and agreeing on how to estimate their costs or what final price to charge, or that retailers and wholesalers are colluding to manipulate

the average posted terminal price. "However, we have been given no indication that such corruption has tainted" the gasoline pricing scheme in Wisconsin, and based on our reading of the challenged provisions, we think the Act "can hardly be viewed as a cloak for any conspiracy" among refiners, wholesalers, or retailers. *See Fisher*, 475 U.S. at 269. Our disposition of this facial challenge does not preclude a future plaintiff, properly armed with evidence of actual collusion among Wisconsin gasoline dealers, from bringing an as-applied challenge to the Act or an enforcement action against those dealers under antitrust laws at a later time.

## III. CONCLUSION

The district court's judgment is REVERSED and the permanent injunction barring Wisconsin from enforcing the Act is DISSOLVED. The case is REMANDED to the district court with instructions to enter judgment for Defendants.