The MUNICIPAL UTILITIES BD. OF ALBERTVILLE; The City of Alexander City; the City of Andalusia; the City of Bessemer; the City of Brundidge; the City of Courtland; the Utilities Board of the City of Cullman, Inc.; the City of Decatur; the City of Dothan; the City of Evergreen; the City of Fairhope; the City of Florence; the Utilities Board of the City of Foley; the Fort Payne Improvement Authority; the Electric Board of Guntersville; the City of Hartford; the Electric Board of the City of Hartselle; the City of Huntsville; the City of Lafayette; the City of Lanett; the Electric Board of the City of Luverne; the Electric Board of the City of Muscle Shoals; the City of Opelika; the Utilities Board of the City of Opp; the City of Piedmont; the City of Robertsdale; the Scottsboro Electric Power Board; the Utilities Board of the City of Sylacauga; the City of Tuscumbia and the Utilities Board of the City of Tuskegee, Plaintiffs–Appellants,

City of Lincoln, Alabama, a municipal corp., Applicant for Intervention–Appellant,

v.

ALABAMA POWER COMPANY; the Alabama Rural Electric Association of Cooperatives; Dixie Electric Cooperative; Covington Electric Cooperative, Inc.; Marshall–DeKalb Electric Cooperative; Southern Pine Electric Coop-

---

erative; Cherokee Electric Cooperative; Cullman Electric Cooperative; Pioneer Electric Cooperative, Inc.; Tombigbee Electric Cooperative, Inc.; Wiregrass Electric Cooperative, Inc.; Joe Wheeler Electric Membership Corporation; Clarke–Washington Electric Membership Corporation; Tallapoosa River Electric Cooperative; Pea River Electric Cooperative; Central Alabama Electric Cooperative; Sand Mountain Electric Cooperative; Franklin Electric Cooperative; North Alabama Electric Cooperative; Baldwin County Electric Membership Cooperation; Coosa Valley Electric Cooperative, Inc.; South Alabama Electric Cooperative, Inc.; Black Warrior Electric Membership Corporation; Arab Electric Cooperative, Inc. and Alabama Electric Cooperative, Inc., Defendants–Appellees.

No. 90–7095.

United States Court of Appeals,
Eleventh Circuit.

July 5, 1991.

Robert D. Thorington, Wendell Cauley, Johnson & Thorington, Montgomery, Ala., Maynard, Cooper, Frierson & Gale, P.C., George G. Lynn, Birmingham, Ala., and Robert A. Jablon, Barbara Eshin, Spiegel & McDiarmid, Washington, D.C., for plaintiffs-appellants.

Charles M. Crook and John Mandt, Balch & Bingham, Montgomery, Ala., for Alabama Power Co.

H.A. Lloyd, Lloyd, Dinning, Boggs & Dinning, Demopolis, Ala., for Black Warrior Elec. Membership Corp.

Edward M. Price, Jr., Farmer, Price, Smith, Hornsby & Weatherford, Dothan, Ala., for Wiregrass Elec. Co-op, Inc.

Gaines, Gaines & Gaines, George C. Douglas, Jr., Talladega, Ala., for Coosa Valley Elec.

Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for all Cooperatives.

Before JOHNSON and HATCHETT, Circuit Judges, and DYER, Senior Circuit Judge.

JOHNSON, Circuit Judge:

The plaintiffs, thirty municipal and public corporations and their boards ("the Cities"), appeal the district court's order dismissing with prejudice their antitrust complaint against twenty-two rural electric cooperatives ("the Cooperatives"), the Alabama Rural Electric Association of Cooperatives ("AREA") and Alabama Power Company ("APC").

## I.  STATEMENT OF THE CASE [1]

### A.  *Background Facts*

The Cities, the Cooperatives, and APC all own and operate electric distribution facilities in the State of Alabama. In 1979, the Alabama Legislature established the Joint Interim Committee on Electricity ("the Committee") to develop legislation "to avoid wasteful, uneconomic duplication of electric facilities, the cost of which must be borne by the consumer." 1979 Ala.Acts 764.[2] In 1984, the Legislature passed the Service Territories for Electric Suppliers Act ("the 1984 Act") for the stated purpose

---

**1.** On March 11, 1991, this Court issued an opinion in this case reversing the district court's dismissal of this case with prejudice and instructing the court to grant the Cities leave to amend their complaint. *Municipal Utilities Bd. of Albertville v. Alabama Power Co.*, 925 F.2d 1385 (11th Cir.1991). In response to the Supreme Court's opinion in *City of Columbia v. Omni Outdoor Advertising, Inc.*, —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), we withheld the mandate and instructed the parties to submit supplemental briefs addressing the effect of *Omni* on the issues in this litigation. We now withdraw our original opinion in this case and issue this corrected opinion in its stead.

**2.** The Alabama Legislature instructed the Committee to develop this legislation in consultation with the three principal distributors of electricity in the state, investor-owned utilities, rural electric cooperatives, and municipal electric systems, *e.g.*, APC, the Cooperatives, and the Cities. 1979 Ala.Acts 764.

of limiting wasteful line duplication. Ala. Code § 37–14–1 et seq. (Supp.1989). The 1984 Act assigned service territories to Alabama's electric suppliers. This legislation was subsequently held invalid by a federal district court and enjoined from enforcement.[3] In 1985, the Legislature passed a second Service Territories for Electric Suppliers Act ("the 1984 Act") in an effort to accommodate the constitutional questions raised by the district court. Ala. Code § 37–14–33 (Supp.1989).[4] The Alabama Supreme Court then held that both Acts were valid. *Alabama Power Co. v. Citizens of Ala.*, 527 So.2d 678 (Ala.1988).

The 1984 and 1985 Acts (collectively "the Acts") establish three sets of rules: (1) those governing activities outside existing city limits (*i.e.*, city boundaries as of April 26, 1984); (2) those governing activities inside existing city limits; and (3) those governing the incorporation of certain listed private agreements into the Acts.

The rules governing service outside existing city limits provide that electric suppliers cannot serve premises already served by another supplier. Ala.Code §§ 37–14–3 & 37–14–32 (Supp.1989). These rules also state that electric suppliers cannot extend their facilities to service new premises located in the service area of another supplier, except for industrial customers whose electric load exceeds 2500 kilowatts. *Id.* The Acts also provide detailed rules to assign specific service areas to each supplier. *Id.*[5] Finally, the Acts prohibit a municipality from serving any customers outside its boundary, even if the city annexes new territory. *Id.*

The rules governing service inside city limits allow the "primary electric supplier" to purchase the facilities of other suppliers within "existing municipal limits" on terms specified in the statute. Ala.Code §§ 37–14–4 & 37–14–33 (Supp.1989). If the primary supplier elects not to purchase these facilities, the statute permits the secondary supplier to maintain these facilities and become the assigned supplier to those new customers that locate "closer to" its lines. *Id.*

The Acts also contain certain "special rules." Ala.Code §§ 37–14–8 & 37–14–36 (Supp.1989). These rules incorporate into the Acts certain listed agreements ("the private agreements") previously reached by electric suppliers. According to the Acts, these agreements govern the prevention of line duplication in the areas they cover. *Id.* The Acts permit suppliers to enter additional agreements consistent with policies and purposes of the Acts provided the suppliers obtain the approval of the Alabama Legislature. *Id.*[6]

### B. *Procedural History*

On May 19, 1989, the Cities filed an antitrust complaint seeking declaratory and injunctive relief and damages against the Cooperatives, AREA, and APC (collectively, "the defendants") for conspiring to suppress competition in the retail electric market in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Clayton Act, 15 U.S.C. § 26. The Cities alleged that the defendants had illegally agreed to divide service territories horizontally and had conspired with members of the Alabama Legislature as well as officials of state government to immunize this antitrust violation

**3.** This Court subsequently found that this case had been wrongfully removed to federal court, and we vacated the district court's judgment. *Dixie Elec. Coop. v. Citizens of Ala.*, 789 F.2d 852 (11th Cir.1986).

**4.** The 1985 Act contains a provision which states that if the courts determine that the 1984 Act was constitutional, then, with a few specified exceptions, those provisions of the 1985 Act that are inconsistent with the 1984 Act will no longer be effective. Ala.Code § 37–14–40 (Supp.1989).

**5.** The Acts define the assigned service area as the area "consisting of a line or lines drawn

equidistant between the existing distribution lines of such electric supplier and the nearest existing distribution line of any other electric supplier. Where a premises is located in the assigned service area of two electric suppliers, the supplier in whose assigned area the majority of the square footage of the premises falls shall provide the service." Ala.Code §§ 37–14–3(1) & 37–14–32(1) (Supp.1989).

**6.** The 1985 Act added certain listed agreements to the agreements incorporated in the 1984 Act. Ala.Code § 37–14–40 (Supp.1989).

by codifying this illegal agreement as the Acts. The complaint challenged all of the defendants' actions associated with this agreement, including their efforts to petition the Alabama Legislature to pass the Acts and their actions taken pursuant to the Acts. Moreover, the Cities sought an order declaring the Acts invalid and unconstitutional.

APC, AREA, and nineteen of the Cooperatives subsequently moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Specifically, they argued that they were immune from antitrust liability under the *Noerr–Pennington* and state action doctrines. APC also argued that the Cities' claims were time-barred because both Acts were passed more than four years prior to the commencement of the action. Coosa Valley Electric Cooperative ("Coosa Valley") also moved to dismiss, arguing that the Cities lacked standing to assert a cause of action under 15 U.S.C. § 15. The City of Lincoln, Alabama, subsequently filed a motion to intervene.

On January 9, 1990, following a hearing, the district court granted the motions to dismiss with prejudice and denied Lincoln's motion to intervene. The court found that the Cities lacked standing to bring claims for any alleged antitrust injury occurring outside the service areas assigned to them by the Acts, but had standing to bring claims for such injuries within their service areas. Nevertheless, the court dismissed these latter claims, finding that the allegedly actionable conduct was immune from antitrust liability under the *Noerr–Pennington* and state action doctrines.

## II. ANALYSIS

### A. *Standing*

▇▇▇ Section 4 of the Clayton Act creates a federal cause of action available to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a).[7] Standing to bring an antitrust claim is a question of law which we determine by examining the allegations contained in the complaint. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir.1991). It involves more than the "case or controversy" requirement of constitutional standing; it also includes "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Id.* (citations omitted).

In its order below, the district court found that the Cities lacked standing to assert claims for alleged antitrust injuries occurring outside the service areas assigned to them under the Acts, but had standing to bring claims for such injuries occurring within their statutory service areas. The court reasoned that the Cities had no inherent right to compete in the retail electricity market, but derived their authority to compete solely from a delegation of state power by the Alabama Legislature. *See* Ala.Code § 11–50A–1 *et seq.* (1989 Supp.). According to the district court, the Sherman Act did not limit the Alabama Legislature's authority to restrain or retract this delegation. In its view, by passing the Acts, the Alabama Legislature had merely modified the authority it had previously delegated to the Cities by limiting the areas in which and customers for whom the Cities could compete. The court therefore concluded that the Cities suffered no antitrust injury from any allegedly anticompetitive acts outside their statutory service territories outside the areas delegated to them by the Alabama Legislature.[8]

The Cities assert that they have standing to challenge any allegedly anticompetitive

---

7. The Cities also seek injunctive relief under Section 16 of the Clayton Act which states that "[a]ny person ... shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26.

8. In its brief, defendant Coosa Valley Electric Cooperative, Inc. ("Coosa Valley") states that the district court's reasoning supports a holding that the Cities lack standing to challenge restrictions or modifications of their existing service areas. Coosa Valley therefore argues that this Court should hold that the Cities have no standing to assert any of their claims in this suit.

acts even if these acts occurred outside their service areas. They argue that once the Alabama Legislature delegated to them the right to compete it may not withdraw such delegation by legislation that violates federal antitrust laws.

■ Federal courts have labored to establish a precise test to determine whether a plaintiff has antitrust standing. *Austin v. Blue Cross and Blue Shield of Ala.*, 903 F.2d 1385, 1388 (11th Cir.1990). This Court has recently followed a two-pronged approach to decide the issue. *Todorov*, 921 F.2d at 1449. Under this approach, we first determine whether the plaintiff has suffered "antitrust injury." *Id.* We then decide whether the plaintiff is an efficient enforcer of the antitrust laws. *Id.* (citing *Cargill, Inc. v. Monfort*, 479 U.S. 104, 110 n. 5, 107 S.Ct. 484, 489 n. 5, 93 L.Ed.2d 427 (1986)); *see also Austin* 903 F.2d at 1389.

■ "Antitrust injury is defined as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Todorov*, 921 F.2d at 1449 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). In general, municipal corporations in Alabama are "creatures of the state, and possess no rights, privileges or immunities independent of those expressly conferred upon them by the state."[9] *City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1254 (5th Cir.1976)[10]; *State ex rel. Britton v. Harris*, 259 Ala. 368, 67 So.2d 26 (1953). In *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 487, 102 S.Ct. 3187, 3203, 73 L.Ed.2d 896 (1982), however, the Supreme Court held that a local elected school board could invoke the Fourteenth Amendment to defend its program of achieving school in-

tegration through busing from attack by the state of Washington. While noting that Washington could have reserved to state officials the right to make all decisions regarding public education and student assignment, the Court ruled that, once the state chose to adopt a system delegating control to local officials, it was obligated to operate that system in accordance with the Fourteenth Amendment. *Id.* The decision in *Washington* therefore established the principle that states may not circumscribe or rescind delegated authority in such a way that impairs federally protected rights. *Id.; see also Sailors v. Board of Educ.*, 387 U.S. 105, 109, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967) (holding that "unless the state ... government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs"); *United States v. State of Ala.*, 791 F.2d 1450, 1456 n. 5 (11th Cir. 1986). The situation in the instant case is analogous to the circumstance presented in *Washington.* Given the importance that the Sherman Act places on free and open competition in the marketplace, once the state of Alabama chose to delegate to the Cities the proprietary right to engage in retail electric sales, it may not rescind that right by legislation that may violate federal antitrust laws. *Washington, supra; Sailors, supra.* Moreover, the district court's delegation analysis is flawed for it has mischaracterized what the Alabama Legislature accomplished by passing the Acts. The Acts did not represent an initial independent decision to rescind or limit the Cities authority to compete in the retail electricity market followed by a second independent decision to impose a regulatory structure suspending competition in the retail electricity market. Rather, these decisions were completely intertwined; the

---

**9.** Courts have often cited this principle as a rule that would bar any suit by a creature of the state against its creator. *City of Safety Harbor*, 529 F.2d at 1254. This Court has rejected such a per se rule. *United States v. State of Ala.*, 791 F.2d 1450, 1455 (11th Cir.1986), *cert. denied sub nom.*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987). Rather, we determine "whether any given constitutional provision or [federal] law protects the interests of the body in question. [But], if no such determination has been made,

it is our task to review de novo whether the state entity has any rights under the particular rule invoked." *Id.*

**10.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

limitation of the Cities' delegated authority to compete in the retail electricity market was a byproduct of the regulatory structure dividing service territories. *See* Ala. Code §§ 37–14–3 & 37–14–32 (Supp.1989). Moreover, the fact that the provisions of the Acts are not severable suggests that the Alabama Legislature intended to limit the Cities' authority to compete in the retail electricity market only by the specific regulatory structure set forth in the Acts. *See* Ala.Code §§ 37–14–17 & 37–14–39 (Supp. 1989) (making the Acts invalid if any of the provisions suspending competition and assigning service territories are later held invalid under the constitution or laws of the state of Alabama). If the Acts are determined to violate the antitrust laws, we cannot tell whether the Alabama Legislature would have still chosen to limit the Cities authority to compete in the retail electricity market. The district court therefore erred when it concluded that the Cities had suffered no injury because they were challenging the rescission of delegated state authority.

■ Nevertheless, we must still determine whether the Cities have antitrust standing under the two-pronged approach discussed above. The first inquiry is whether the Cities have alleged an antitrust injury.[11] In their complaint, the Cities alleged that the defendants deprived them of the opportunity to compete for future customers by entering into a preexisting, illegal, anticompetitive agreement which divided Alabama into exclusive retail electric territories. The Cities further alleged that this illegal agreement was merely ratified by the Alabama legislature and embodied in the Acts.[12] This injury certainly falls within the class of injuries which the Sherman Act sought to protect against. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). There is a close relationship between the Cities' claimed injury

and the alleged antitrust violation; the Acts limit the Cities' ability to compete for future customers by excluding them from territories where they formerly competed. A state may not immunize essentially private anticompetitive conduct from antitrust liability merely by covering it with the "gauzy cloak of state involvement." *Id.* at 106, 100 S.Ct. at 943. Because the Cities claim that the Acts represent an attempt by the State of Alabama to immunize the defendants' anticompetitive agreements, they have alleged an antitrust injury.

■ We must still determine whether the Cities are an efficient enforcer of the antitrust laws, the second prong of the approach set forth in *Todorov, supra.* This inquiry "involves an analysis of 'other factors in addition to antitrust injury.'" *Todorov,* 921 F.2d at 1450 (quoting *Cargill,* 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6). These factors include evaluating whether the injury was direct or indirect. *Id.* at 1451. Although the defendants' allegedly anticompetitive conduct would also injure consumers, such conduct would also directly injure the Cities as competitors. The Cities are therefore an efficient enforcer of the antitrust laws. Because the Cities have alleged an antitrust injury and are an efficient enforcer of the antitrust laws, they have standing to challenge the defendants' anticompetitive conduct regardless of where it occurs in Alabama.

### B. *Dismissal of the Cities' Claims*

■ When reviewing a district court's order dismissing a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court will presume the allegations of the complaint to be true and liberally construe the complaint in the plaintiff's favor. *Burch v. Apalachee Community Mental Health Servs., Inc.,* 840 F.2d 797, 798 (11th Cir.1988) (en banc), *aff'd sub nom., Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975,

---

**11.** As a preliminary matter, we note that the Cities are persons within the meaning of the Sherman Act. *See City of Lafayette, La. v. Louisiana Power & Light Co.,* 435 U.S. 389, 395, 98 S.Ct. 1123, 1127, 55 L.Ed.2d 364 (1978).

**12.** The Cities also alleged that the defendants conspired with unnamed state officials and members of the Alabama Legislature to enact this illegal agreement.

108 L.Ed.2d 100 (1990). A motion to dismiss will be denied " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

■ "[N]otice pleading is all that is required for a valid antitrust complaint." *Quality Foods de Centro America, S.A. v. Latin Am. Agribusiness Dev. Corp.,* 711 F.2d 989, 995 (11th Cir.1983) (citation omitted). A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified. Conclusory allegations "will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief.... However, the alleged facts need not be spelled out with exactitude, nor must recovery appear imminent." *Id.* (citations omitted).

### 1. *Dismissal Under the State Action Doctrine*

The district court found that the defendants enjoyed state action immunity for their actions taken pursuant to the Acts and therefore dismissed the Cities' claims relating to these actions. The Cities contend that the defendants' actions do not qualify for state action immunity for two reasons. First, they argue that they have alleged an illegal conspiracy between public officials and the defendants thereby triggering the "public co-conspirator" exception to the state action doctrine. Second, the Cities claim that the Acts are facially invalid because neither the general provisions of the Acts [13] nor the private agreements incorporated in the Acts [14] comply with either prong of the test for state action immunity set forth in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). The Cities therefore argue that the defendants

are not entitled to state action immunity for actions taken pursuant to the Acts.

While this case was pending on appeal, the Supreme Court issued its opinion in *City of Columbia v. Omni Outdoor Advertising, Inc.,* —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), holding that there was no public co-conspirator exception to the state action doctrine. Accordingly, this component of the Cities' argument is now foreclosed. We therefore address only the Cities' argument that the Acts do not satisfy the *Midcal* test for state action immunity.

■ In *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), the Supreme Court held that Congress did not intend the Sherman Act to prevent action by the states to restrain competition. At the same time, a state may " 'not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful.' " *Omni,* —— U.S. at ——, 111 S.Ct. at 1353 (quoting *Parker,* 317 U.S. at 351, 63 S.Ct. at 314). A state statute limiting competition will not run afoul of the Sherman Act provided that: (1) the challenged state statute was implemented pursuant to a clearly articulated state policy restraining competition; and (2) the policy was actively supervised by the state. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. The supervision prong prevents a state from frustrating the national policy in favor of competition by casting a shadow of state involvement over what is essentially private anticompetitive conduct. *Id.* at 106, 100 S.Ct. at 943. Private parties charged with violating the Sherman Act, such as the defendants in this case, may assert immunity under the state action doctrine provided their actions were taken pursuant to state legislation meeting the requirements of the *Midcal* test. *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 61, 105 S.Ct. 1721, 1728, 85 L.Ed.2d 36 (1985). Accordingly, to decide whether the defen-

---

**13.** The general provisions of the Acts are those sections which set forth the rules governing the division of the Alabama retail market into service territories. *See* Ala.Code §§ 37–14–3, 37–

14–4, 37–14–32, 37–14–33 (Supp.1989) (collectively "the general provisions").

**14.** *See* Ala.Code §§ 37–14–8 & 37–14–36 (Supp. 1989).

dants qualify for state action immunity, we must determine whether the Acts satisfy both prongs of the *Midcal* test.

### a. Clearly Articulated State Policy

■ The Cities concede that the Acts set forth a state policy to restrain competition in retail electric service in order to prevent duplication of electric facilities. *See* Ala.Code. §§ 37–14–1 & 37–14–30. The Cities argue, however, that the stated policy is a sham because the Acts permit some line duplication in the competition for industrial customers.[15]

■ The Supreme Court has held that so "long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied." *Southern Motor Carriers*, 471 U.S. at 64, 105 S.Ct. at 1730. The state policy authorizing the anticompetitive conduct does not have to be expressly articulated, however, if the statute provides for "a regulatory scheme that inherently 'displace[s] unfettered business freedom.' " *Executive Town & Country Servs., Inc. v. City of Atlanta*, 789 F.2d 1523, 1529 (11th Cir. 1986) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 109, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978)).

The Alabama Legislature has clearly articulated a policy to displace competition in the retail electric market except for large industrial customers. *See Ala.Code* §§ 37–14–1 & 37–14–30 (reducing the costs of line duplication is the policy supporting this regulation). The sections of the Acts which incorporate the private agreements state that the Legislature has determined that these agreements are consistent with the general purpose of the Acts to avoid line duplication. Ala.Code §§ 37–14–8, 37–14–36 (Supp.1989). Moreover, as we discuss below in section IIB(1)(b), the Acts provide for a regulatory scheme that clearly displaces competition. Finally, the Supreme Court has never stated that the regulations adopted to displace competition must be perfectly consistent with the articulated policy reasons supporting those regulations. Our inquiry under the first prong of the *Midcal* test is merely whether there is a clearly articulated state policy to displace competition, not whether the adopted regulations are the best means to accomplish that policy. Accordingly, we find the Acts satisfy the first prong of the *Midcal* test.

### b. Active State Supervision

■ The second prong of the *Midcal* test requires that the state actively supervise any private anticompetitive conduct taken pursuant to the regulatory scheme. *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943. The district court found that the Acts strictly controlled the assignment of service areas to electric providers and left no room for private discretion in the assignment of service areas. The court concluded that Alabama had actively supervised all private behavior taken pursuant to the Acts.[16]

The Cities contend that the general provisions of the Acts fail to meet the supervision prong of *Midcal* because they do not provide for a state agency to supervise private behavior under the Acts or for a method for resolving potential disputes over such issues as which electric supplier serves customers at territorial boundary lines. *See* Ala.Code §§ 37–14–3, 37–14–4, 37–14–32, 37–14–33 (Supp.1989). They also state that the Alabama Legislature failed to provide for any state supervision of the private agreements incorporated into the Acts and argue that this omission causes the private agreements to violate the supervision prong of *Midcal*. *See Ala.Code* §§ 37–14–8, 37–14–36 (Supp.1989). We will address these concerns in order.

---

**15.** The Acts permit electric suppliers, except for the Cities, to compete for industrial customers whose electric loads exceed 2500 kilowatts, even if these customers are located in the service area assigned to another supplier. Ala.Code §§ 37–14–3 & 37–14–32 (Supp.1989).

**16.** The court did note that the Acts give primary suppliers in every municipality the discretion to purchase the distribution facilities of any secondary suppliers within the municipality. The terms and conditions of such purchases are strictly regulated. *See Ala.Code* § 37–14–4.

The purpose of the supervision prong is to ensure that private anticompetitive conduct promotes state policy rather than the interests of private parties. *Patrick v. Burget*, 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). In determining whether state legislation satisfies the supervision prong, the Supreme Court has focused its inquiry upon whether private parties or public authorities made the operative decisions regarding the challenged anticompetitive conduct. The Court has consistently held that state statutes which grant private actors " 'a degree of private regulatory power' " violate the Sherman Act and do not qualify for state action immunity. *Fisher v. City of Berkeley*, 475 U.S. 260, 268, 106 S.Ct. 1045, 1050, 89 L.Ed.2d 206 (1986) (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 665, 102 S.Ct. 3294, 3302, 73 1042 L.Ed.2d (1982) (Stevens, J., concurring)); *see also Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663 (holding hospital peer-review committees failed to meet the requirements of the supervision prong because private parties exercising decision-making authority were not subject to state supervision); *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943 (holding that statute that authorized price setting by private parties and then enforced those prices failed the supervision prong).[17]

With regard to the general provision of the Acts, the Alabama Legislature has control over all of the decisions being challenged by the Cities in this litigation, *e.g.*, to divide service territories inside and outside municipal limits and to limit competition for large industrial customers of electricity. The general provisions of the Acts have placed no decision-making authority over restraints on competition in the hands of private parties. The general provisions of the Acts set forth the precise procedures that suppliers must follow to divide service areas outside municipal limits. Ala.Code §§ 37–14–3 & 37–14–32 (Supp.1989).[18] The Acts also grant state courts jurisdiction to resolve disputes over alleged violations of the Acts. Ala.Code §§ 37–14–9 & 37–14–37 (Supp.1989). An electric supplier may initiate an action to enjoin another supplier from violating the provisions of the Acts, *e.g.*, invading the service area of another supplier, and to obtain damages. *Id.*

The general provisions of the Acts eliminate virtually all discretionary behavior by retail electric suppliers outside their service territories and therefore attempt to ensure that all actions taken by the suppliers pursuant to the Acts will serve the policy goals of the Acts.[19] The general provisions of the Acts simultaneously reflect the Alabama Legislature's decision to limit competition in Alabama's retail electric market by dividing the state into service territories, and its determination as to means by which such division shall be accomplished. *See* Ala.Code §§ 37–14–3, 37–

**17.** We note that "it would be unacceptable ever to impose statutory liability on a party who had done nothing more than obey a state command." *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 592, 96 S.Ct. 3110, 3118, 49 L.Ed.2d 1141 (1976). Where the challenged state regulation "involved a mixture of public and private decisionmaking ... [despite] state participation in the decision, the private party exercised sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision." *Id.* at 593, 96 S.Ct. at 3119. Therefore, when the challenged state statute restraining competition delegates regulatory authority to private parties, the private parties may be held liable for their actions that violate federal antitrust laws. *Fisher*, 475 U.S. at 268, 106 S.Ct. at 1050; *see also Patrick*, 486 U.S. at 101, 108 S.Ct. at 1663; *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943; *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

**18.** For example, the Acts provide the procedure for determining which supplier will provide service to a customer whose premises are located in two service areas. *See* Ala.Code §§ 37–14–3(1) & 37–14–32(1) (Supp.1989) ("Where a premises is located in the assigned service area of two electric suppliers, the supplier in whose assigned area the majority of the square footage of the premises falls shall provide the service.").

**19.** The principal discretion left to electric suppliers by the general provisions is the decision by a primary supplier within existing city limits to purchase the facilities of other suppliers within those city limits on terms specified in the Acts. Ala.Code §§ 37–14–3, 37–14–32 (Supp. 1989). Of course, electric suppliers retain their discretionary authority over the normal operating decisions necessary to service customers within their territories.

14-4, 37-14-32 & 37-14-33 (Supp.1989). Unlike the defendants in *Patrick, supra,* or *Midcal, supra,* the defendants in this litigation do not exercise any private regulatory power. Accordingly, the general provisions of the Acts fulfill both prongs of the *Midcal* test and are exempt from the Sherman Act.

This conclusion is supported by the decision in *Fisher v. City of Berkeley, supra.* In *Fisher,* the plaintiffs challenged a city ordinance imposing rent ceilings on residential real property as constituting price fixing in violation of the Sherman Act. The Supreme Court held that, because the rent ceilings were imposed by the city and not by private parties, the restraint was not concerted action within the meaning of the Sherman Act. *Fisher,* 475 U.S. at 268-69, 106 S.Ct. at 1050-51. Of course, the general provisions of the Acts challenged in this litigation divide market territories instead of imposing price ceilings. Like *Fisher,* however, government officials, not private actors, made the operative decisions codified in the general provisions of the Acts. *See also 324 Liquor Corp. v. Duffy,* 479 U.S. 335, 344 n. 6, 107 S.Ct. 720, 725 n. 6, 93 L.Ed.2d 667 (1987); *Morgan v. Division of Liquor Control,* 664 F.2d 353, 356 (2nd Cir.1981) (holding state statute regulating liquor prices by imposing a minimum markup left little or no discretion to private parties and therefore satisfied the supervision prong of *Midcal* ).

The Cities also argue that by passing the Acts the Alabama Legislature merely "ratified" a private anticompetitive agreement among the defendants. They argue that *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), stands for the proposition that the state action doctrine does not permit a state to immunize unlawful private anticompetitive conduct by passing a law declaring it legal, and they contend that this principle was bolstered by the Supreme Court's recent decision in *Omni, supra.*

The Cities are correct that the Supreme Court has long recognized that the state action doctrine does not permit a state to frustrate the national policy in favor of competition by casting a shadow of state involvement over what is essentially private anticompetitive conduct. *Midcal,* 445 U.S. at 106, 100 S.Ct. at 943. The Court developed the two-prong *Midcal* test precisely for this reason—to ensure that state legislation that restrained competition actually furthered state goals and not merely private interests. *Id.* As discussed above, the general provisions of the Acts meet the *Midcal* test. Accordingly, with regard to the general provisions of the Acts, the Cities' ratification argument fails.

We now turn our attention to the private agreements dividing service territories in order to determine whether they meet the supervision prong of the *Midcal* test. Although the private agreements are listed in the Acts, *see Ala.Code §§ 37-14-8, 37-14-36 (Supp.1989),* the terms of these agreements are contained neither in the Alabama Code nor in the record of this case. In finding that the Acts controlled all discretionary behavior by private parties, the district court discussed only the general provisions of the Acts, not the terms of the private agreements.[20] The Supreme Court recently reiterated the principle that states may not immunize private anti-competitive conduct merely by authorizing it. *Omni,* —— U.S. at ——, 111 S.Ct. at 1353. It is to protect against just such a situation that the Court imposed the active supervision prong of the *Midcal* test. *Midcal,* 445 U.S. at 106, 100 S.Ct. at 943. Because the terms of the private agreements are not in the record of this case or in the Alabama Code, we are unable to determine whether they comply with the active state supervision prong of the *Midcal* test. We therefore cannot determine whether the private agreements qualify for state action immunity. Accordingly, we remand this question to the district court for findings consistent with our discussion of the requirements of the active state supervision

---

**20.** The district court discussed the section of the 1984 Act governing private agreements, but only in reference to the mechanism for private par-

ties to petition the Alabama Legislature to approve additional private agreements regarding service territories.

prong of the *Midcal* test. In remanding this question, we make no comment as to its proper resolution. We note, however, that if the district court should determine that the private agreements comply with the *Midcal* test then dismissal is proper.

2. *Dismissal Under Noerr–Pennington*

■ The district court dismissed with prejudice those claims by the Cities based on the defendants' allegedly anticompetitive conduct prior to the passage of the Acts. The court reasoned that the defendants' actions were immune from antitrust liability under the *Noerr–Pennington* doctrine because the Cities failed to allege any facts to suggest that the defendants' actions consisted of anything besides petitioning the Alabama Legislature to pass the Acts.

The Cities argue, as they did in their challenge to the defendants' claim for state action immunity, that they have alleged sufficient facts to trigger a "ratification exception" and a "public co-conspirator" exception to the *Noerr–Pennington* doctrine. The Cities accordingly claim that the district court erred in dismissing their claims. As noted above, the Supreme Court has recently held that there is no "public co-conspirator" exception to the *Noerr–Pennington* doctrine. *Omni, supra.* Accordingly, the Cities' claim under this theory is now foreclosed. We therefore address only the Cities' claim to a ratification exception to the *Noerr–Pennington* doctrine.

■ Joint efforts among competitors to restrain or monopolize trade by petitioning government officials are immune from antitrust liability under the *Noerr–Pennington* doctrine. *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 499, 108 S.Ct. 1931, 1936, 100 L.Ed.2d 497 (1988) (citing *Eastern RR President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 669–672, 85 S.Ct. 1585, 1592–1595, 14 L.Ed.2d 626 (1965)). The boundaries of this protection are determined by "the source, context, and nature of the anticompetitive restraint at issue." *Id.* When a restraint on trade " 'is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Id.* (quoting *Noerr,* 365 U.S. at 136, 81 S.Ct. at 529).

This Court has not recognized a ratification exception to the *Noerr–Pennington* doctrine. Moreover, such an exception would likely swallow the rule. It would permit the losers of legislative battles to claim that any coordination by their successful opponents amounted to a prior agreement which was then "ratified" by the legislature. If the *Noerr–Pennington* doctrine is to have any effect, plaintiffs cannot be allowed to use the mere existence of state legislation restraining trade to bootstrap an antitrust claim against the supporters of that legislation.[21]

## III. CONCLUSION

We AFFIRM the district court's finding that the general provisions of the Acts qualify for state action immunity under the two-prong *Midcal* test. We cannot, however, make the same determination regarding the private agreements incorporated into the Acts because the terms of these agreements are contained neither in the record of this case nor in the Alabama Code. We are therefore unable to decide whether the private agreements satisfy the active supervision prong of the *Midcal* test. Accordingly, we REVERSE and REMAND

21. The Supreme Court's holding in *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), does not support the Cities' claim of a ratification exception to the *Noerr–Pennington* doctrine. In *Allied Tube,* the conduct at issue was an attempt to influence a private standard setting organization to draft codes, which were frequently adopted by state governments, that would exclude the plaintiff. This action did not qualify for protection under *Noerr–Pennington* because the defendants were not attempting to influence the government. *Allied Tube,* 486 U.S. at 504, 108 S.Ct. at 1939. In the instant case, the Cities challenge the defendants' conduct in directly petitioning the Alabama Legislature.

for proceedings to determine whether the private agreements incorporated into the Acts qualify for state action immunity. Our remand should not be viewed as a comment on the merits of this question. Because the City of Lincoln's claim rests on the same facts as the Cities' claim, we REVERSE the district court's order denying the City of Lincoln's motion to intervene.