**PEDIATRIC NEPHROLOGY ASSOCIATES OF SOUTH FLORIDA, et al., Plaintiffs,**

v.

**VARIETY CHILDREN'S HOSPITAL, et al., Defendants.**

**Case No. 1:16–cv–24138–UU**

United States District Court, S.D. Florida.

Signed December 28, 2016

Entered December 29, 2016

1348

Carolina Zambrano Goncalves, Kevin Crow Kaplan, Scott Andrew Hiaasen, Coffey Burlington, P.L., Benjamin Henry Brodsky, Brodsky Fotiu–Wojtowicz, PLLC, Miami, FL, for Plaintiffs.

Jerome Wayne Hoffman, Laura Beard Renstrom, Holland, Knight LLP, Jacksonville, FL, Kevin W. Cox, Holland, Knight LLP, Tallahassee, FL, for Defendants.

## ORDER

Ursula Ungaro, UNITED STATES DISTRICT JUDGE

THIS CAUSE comes before the Court upon Defendants' Partial Motion to Dismiss or for More Definite Statement of Plaintiff's First Amended Complaint. D.E. 27.

THE COURT has considered the Motion, the pertinent portions of the record and is otherwise fully advised in the premises.

## FACTUAL ALLEGATIONS

The following facts are taken from Plaintiff's First Amended Complaint. D.E. 19.

### A. The Parties

Defendant, Pediatric Specialty Group, Inc. ("PSA"), is a pediatric physician practice group that was formed in 2015 and is owned by Defendant, Variety Children's Hospital, formerly known as Miami Children's Hospital, currently doing business as Nicklaus Children's Hospital (the "Hospital"). *Id.* ¶ 16. Defendant, Narendra Kini, M.D. ("Dr. Kini") and Defendant, Leonard Feld, M.D. ("Dr. Feld"), controlled PSA on behalf of both the Hospital and PSA in an attempt to take control of and monopolize the pediatric physician groups that were practicing at the Hospital. *Id.*

As a part of its strategy to control the pediatric physician groups at the Hospital, PSA recruited existing physician groups at the Hospital. *Id.* ¶ 17. If the physician groups refused to join PSA, the groups would be subjected to aggressive punishments by PSA. *Id.* In addition, the Hospital and PSA instituted a policy under which PSA-employed physicians are directed to refer their patients only to other PSA-employed physicians. *Id.* ¶ 18. For example, the practice group that handles the hospital's emergency room has joined PSA, which means that every patient who comes into the Hospital for treatment through the emergency room is automatically referred to a PSA-employed specialist depending on the treatment that is needed. *Id.*

Plaintiff, Pediatric Nephrology Associates of South Florida ("PNASF"), has been the pediatric nephrology practice group at the Hospital for over twenty (20) years. *Id.* ¶ 19. At the time PSA initiated discussions with PNASF to join PSA, PNASF's partners consisted of Plaintiffs, Anselmo Cepero, M.D. ("Dr. Cepero"), Ana Paredes, M.D. ("Dr. Paredes"), and Defendant, Felix Ramirez–Seijas, M.D. ("Dr. Ramirez"). *Id.* Dr. Cepero has been practicing pediatric nephrology for over thirty (30) years, and in January 2016, he was elected by his peers to serve as the Hospital's Pediatric Nephrology Division Director. *Id.* ¶ 20. Prior to his termination by the Hospital, he served as the Medical

Director of Urodynamics at the Hospital's Center for Enuresis & Urinary Disorders. *Id.* Dr. Paredes has also been practicing pediatric nephrology for over thirty (30) years, was the Director of Renal Research at the Hospital, and was consistently ranked as the best teacher by the residents practicing at the Hospital. *Id.* ¶ 21. Prior to her termination by the Hospital, Dr. Paredes served as the Program Director of the Hospital's Dialysis Center. *Id.*

### B.  PSA's Initial Discussions with PNASF

In late August 2015, Dr. Feld requested a meeting with the partners of PNASF in an attempt to recruit the PNASF physicians to join PSA. *Id.* ¶ 22. Dr. Ramirez entertained PSA's recruiting efforts, while Dr. Cepero and Dr. Paredes remained inclined to continue their partnership with PNASF. *Id.* ¶ 23. Dr. Cepero and Dr. Paredes agreed to speak with PSA regarding the potential association; however, before doing so, they signed confidentiality agreements with PSA to ensure that their partnership's proprietary information would remain confidential and protected. *Id.*

By October 2015, without a vote of the partnership and without his partners' consent, Dr. Ramirez agreed to join PSA and created a pediatric nephrology practice group that would compete with his own partnership, PNASF. *Id.* ¶ 24. On October 16, 2015, Dr. Feld sent emails to colleagues across the country and asked them to post a job opening for a pediatric nephrologist to join the Hospital and PSA's rival practice group. *Id.* ¶ 25. Dr. Ramirez was copied on those e-mails, and he subsequently participated in the recruitment efforts; however, Dr. Cepero and Dr. Paredes were excluded from these e-mails. *Id.*

In advertising this position, Dr. Feld took PNASF's confidential business information, including the number of its patient visits and patients under special treatment, and represented this information as PSA's own accomplishments in order to make the position more attractive. *Id.* ¶ 26. Dr. Feld obtained this information from Dr. Ramirez. *Id.*; D.E. 19–1. In addition, Dr. Ramirez held himself out as the new head of the rival practice group. *Id.* ¶ 27. In the e-mailed job listing from October 16, 2015, the Hospital and PSA indicated that the new practice group is "under the direction of Felix Ramirez, M.D." *Id.*; D.E. 19–2.

### C.  Dr.  Ramirez's  Disassociation from PNASF

As Dr. Cepero and Dr. Paredes continued to resist PSA's efforts to acquire their practice, the Hospital and PSA increased pressure on Plaintiffs. *Id.* ¶ 28. Dr. Ramirez told Dr. Cepero and Dr. Paredes that his new pediatric nephrology practice group would directly compete with PNASF, and Dr. Feld and Dr. Kini also set up a series of meetings with Plaintiffs to force Dr. Cepero and Dr. Paredes to submit under similar threats. *Id.* However, once Dr. Cepero and Dr. Paredes learned that Dr. Ramirez was involved in the creation and recruitment for the rival practice group, both doctors gave notice to Dr. Ramirez that he had been disassociated from the partnership as a result of this conduct. *Id.* ¶ 29.

In the meantime, Hospital and PSA continued their campaign to retaliate against Dr. Cepero and Dr. Paredes and compete with PNASF. *Id.* ¶ 31. Dr. Kini and Dr. Feld began instructing other physicians to stop referring patients to Dr. Cepero and Dr. Paredes, and to instead, refer patients to Dr. Ramirez and PSA. *Id.* ¶ 32. Dr. Kini, Dr. Feld, and Dr. Ramirez concocted a scheme to evict the partnership from the Hospital on the ground that the partnership had dissolved. *Id.* The Defendants contended in papers filed in state court

that Dr. Cepero and Dr. Paredes were the partners who chose to leave the partnership, when it was Dr. Ramirez who was asked to leave after he announced that he was forming a competing practice. *Id.*

### D. The Hospital's Breach of Contract

In a letter sent by Dr. Kini, the Hospital terminated the Teaching Services Agreement that it had signed with PNASF, which provided a source of professional and financial benefits to Dr. Cepero and Dr. Paredes. *Id.* ¶ 33; D.E. 19–3. Dr. Kini failed to renew Dr. Paredes' contract as Program Director of the Dialysis Center, a position that she held since 2006. *Id.* ¶ 34; D.E. 19–4. In January 2016, Dr. Cepero was elected by his peers to serve as the Hospital's Pediatric Nephrology Division Director; however, he had not been paid for his work as the Division Director, and Dr. Kini and Dr. Feld attempted to undermine Dr. Cepero's position by creating a rival position for Dr. Ramirez as "Section Chief" of PSA's nephrology practice. *Id.* ¶ 35. The Hospital Defendants also "hacked" into Plaintiffs' e-mails for its own strategic benefit, and obtained e-mails that included Plaintiffs' confidential and privileged communications with counsel and others regarding the Hospital Defendants' misconduct and the ensuing litigation. *Id.* ¶ 36.

On November 4, 2016, Plaintiffs filed their Complaint against Defendants, asserting the following claims: (1) Violation of the Lanham Act, 15 U.S.C. § 1125 against Defendants, the Hospital, PSA, Dr. Ramirez, Dr. Kini, and Dr. Feld (collectively, "the Hospital Defendants"), (2) Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 against the Hospital Defendants, (3) Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 against the Hospital, (4) Breach of Fiduciary Duty against Dr. Ramirez, (5) Aiding and Abetting Breach of Fiduciary Duty against the

Hospital, PSA, Dr. Kini, and Dr. Feld, (6) Conspiracy against Dr. Ramirez, the Hospital, PSA, Dr. Kini, and Dr. Feld, (7) Tortious Interference with Advantageous Professional Relationship against the Hospital and PSA, (8) Conspiracy to Tortiously Interfere with an Advantageous Professional Relationship against the Hospital, PSA, and Dr. Ramirez, and (9) Breach of Contract against the Hospital.

### LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) provides that a plaintiff's pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has stated that a plaintiff must submit "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

In considering a motion to dismiss for failure to state a cause of action, the "plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Simpson v. Sanderson Farms, Inc.,* 744 F.3d 702, 708 (11th Cir. 2014) (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). Although "[a] plaintiff need not plead 'detailed factual allega-

tions[,] ... a formulaic recitation of the elements of a cause of action will not do,'" and the plaintiff must offer in support of its claim "sufficient factual matter, accepted as true, to 'raise a right to relief above the speculative level.'" *Simpson*, 744 F.3d at 708 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

## ANALYSIS

In their Motion to Dismiss, Defendants move to dismiss Counts II, III, IV, VI, VII, and IX of Plaintiffs' First Amended Complaint. D.E. 27. The Court addresses the parties' arguments pertaining to each of the relevant counts.

### 1. Count II: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 against the Hospital Defendants

The Hospital Defendants move to dismiss Count II on the grounds that Plaintiffs failed to allege sufficient facts to support the existence of an agreement to restrain trade with one or more competitors and failed to provide allegations pertaining to who the non-PSA physician co-conspirators are, or when the alleged conspiracy began. D.E. 27. The Hospital Defendants argue that a corporation cannot conspire with its affiliates and employees, and because Plaintiffs only alleged a conspiracy among Defendants and PSA-employed physicians, Plaintiffs' claim under Section 1 of the Sherman Act fails.

In opposition, Plaintiffs argue that they have sufficiently stated a claim under Section 1 of the Sherman Act because they alleged that the Hospital-affiliated Defendants conspired with Dr. Ramirez, who was acting in his individual capacity for his own financial gain, and with non-PSA physicians who were working at the Hospital. D.E. 19 ¶¶ 46–54. In addition, Plaintiffs argue that they have alleged Dr. Ramirez was acting to advance his own independent financial interests to gain an advantage over Plaintiffs in a separate lawsuit re-

garding their partnership. *Id.* ¶ 52. Plaintiffs further insist that the Hospital Defendants conspired with Dr. Ramirez before he became an employee of the PSA because he was an independent actor in the marketplace at that time. *Id.* ¶¶ 24–28. Lastly, Plaintiffs argue that they are not required to identify the non-PSA doctors who participated in the conspiracy under existing case law, and they should be entitled to proceed to discovery on this issue.

■ Section 1 of the Sherman Act provides as follows:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the Several States or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. "A § 1 conspiracy to restrain trade does not need to allege the specific element of a conspiracy to monopolize, but must allege 1) an agreement to enter a conspiracy, 2) designed to achieve an unlawful objective." *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258 (11th Cir. 1998) (citing *United States Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993)). The Eleventh Circuit Court of Appeals has acknowledged that "Section One applies only to agreements between two or more businesses; it does not cover unilateral conduct." *Spanish Broadcasting Sys. of Fla., Inc. v. Clear Channel Comms., Inc.*, 376 F.3d 1065 (11th Cir. 2004) (citing *Fisher v. City of Berkeley*, 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986)). However, if the "officers or employees act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employers for purposes of Section 1." *St. Joseph's Hosp., Inc. v. Hosp. Corp. of America*, 795 F.2d 948, 956 (11th Cir. 1986).

■ In their Amended Complaint, Plaintiffs allege that the Hospital-affiliated

Defendants and Dr. Ramirez, conspired with other physicians who were not employed by the Hospital or its affiliates to steer patient referrals exclusively to PSA-employed specialists, and away from PNASF, Dr. Cepero, or Dr. Paredes. D.E. 19 ¶¶ 46–54. Plaintiffs allege that through his participation in the conspiracy, Dr. Ramirez was acting to advance his own independent financial interests in an attempt to exert pressure on Plaintiffs in a related legal action concerning their partnership. *Id.* ¶ 52.

The Court rejects Defendants' argument that Plaintiffs have failed to adequately plead the conspiracy element of a claim under Section 1 of the Sherman Act. As Plaintiffs point out, the Eleventh Circuit has recognized an exception to the general rule that officers or employees of a company are not legally capable of conspiring with their employers in situations where the officers or employees "act for their own interests, and outside the interests of the corporation[.]" *See St. Joseph's Hosp., Inc.*, 795 F.2d at 956. Moreover, the Court agrees with Plaintiffs that they are not required to name the non-Hospital affiliated co-conspirators to state a claim under the Sherman Act. *See Boczar v. Manatee Hosps. & Health Sys., Inc.*, 993 F.2d 1514, 1516 (11th Cir. 1993) (upholding jury verdict in favor of doctor alleging conspiracy between hospital and "unnamed conspirator"); *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-cv-734-J-20JRK, 2015 WL 9987969, at *15–16 (M.D. Fla. Nov. 4, 2015) (finding a plaintiff adequately stated a Sherman Act conspiracy between contact lens distributor and "unnamed" co-conspirators).

However, what is glaringly deficient is Plaintiffs' failure to allege throughout the Amended Complaint facts which would show when Dr. Ramirez began to participate in the subject conspiracy. As pleaded, it is unclear as to when Dr. Ramirez was actually disassociated from PNASF, and it is also unclear as to Dr. Ramirez's conduct that occurred prior to and subsequent to his disassociation from PNASF. The Court recognizes that Plaintiffs are not required to plead their claim with heightened specificity, but finds such that the timing of these events is relevant to the existence of the conspiracy at issue, as well as to Dr. Ramirez's alleged breaches of his fiduciary duty, as discussed *infra*. Plaintiffs also argue that "[o]bviously, Dr. Ramirez was an independent actor in the marketplace at that time," but that is not obvious based on the allegations pleaded in Plaintiffs' Amended Complaint. If meritorious, such allegations should be pleaded in Plaintiffs' Complaint, and "that time" period should be specifically alleged. Accordingly, Defendants' Motion to Dismiss Count II is GRANTED, and Count II is DISMISSED WITHOUT PREJUDICE.

**2. Count III: Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**

In their Motion to Dismiss, Defendants argue that Count III should be dismissed because Plaintiffs failed to sufficiently allege that they suffered a loss aggregating at least $5,000, failed to allege that they suffered "damage" by reason of a violation of the Computer Fraud and Abuse Act ("CFAA"), and failed to allege that they suffered "loss" in the form of interruption of service. Defendants also argue that Plaintiffs' claim inaccurately alleges that the Hospital "hacked" into "Plaintiffs' computers." *See* D.E. 19 ¶ 36. Lastly, Defendants insist that the CFAA creates only a limited private right of action "against the violator," and there is no "vicarious liability" such to make the Hospital liable for the actions of its employees.

The CFAA authorizes a civil action by one "who suffers damage or loss by reason

of a violation of this section ... against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action ... may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g). Therefore, to state a claim, Plaintiffs must allege that Defendants' conduct involves one of the following five factors:

(I) Loss to 1 or more persons during any 1–year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(II) The modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(III) Physical injury to any person;

(IV) A threat to public health or safety; or

(V) Damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security[.]

18 U.S.C. § 1030(c)(4)(A)(I)–(V).

As an initial matter, to state a claim under the CFAA, Plaintiffs must show that it suffered loss or damage. 18 U.S.C. § 1030(g). Under CFAA, "damage" means "any impairment to the integrity of availability of data, a program, a system or information[.]" 18 U.S.C. § 1030(e)(8). "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition pri-

or to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

■ The basis for Plaintiffs' claim under the CFAA is that Defendants' "hacked" into Plaintiffs' e-mails to obtain proprietary information for improper uses, specifically "to cause the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment or care of one or more of Plaintiffs' patients." D.E. 19 ¶ 62. In conclusory allegations, Plaintiffs allege that Defendants' acts "caused or is likely to cause physical injury, and constitutes a threat to public health." *Id.* ¶ 63.

The Court finds that Plaintiffs' claim fails for a number of reasons. As a threshold issue, the Court is not convinced that Plaintiffs have standing to proceed with this claim. The damage and loss alleged in the Complaint is that Plaintiffs' patients have suffered or may suffer damages, not Plaintiffs themselves. Assuming Plaintiffs have standing, however, Plaintiffs still fail to allege any cognizable "loss" or "damage" that would fall within CFAA's definition of "loss" or "damage." Similar to the district court's finding in *Andritz, Inc. v. Southern Maintenance Contractor, LLC,* 626 F.Supp.2d 1264, 1266 (M.D. Ga. 2009), the allegations of "loss" or "damage" pertain to Defendants' improper use of Plaintiffs' protected proprietary data, not the *deletion and/or alteration* of the data, which is a required element under the CFAA. *See Cont'l Grp., Inc. v. KW Prop. Mgmt., Inc.,* 622 F.Supp.2d 1357, 1371 (S.D. Fla. 2009) (rejecting contention that "unauthorized access can be damage," and holding that "the data must be impaired and not merely copied"); *Lockheed Martin Corp. v. Speed,* No. 6:05-CV-1580-ORL-31, 2006 WL 2683058 (M.D. Fla. Aug. 1, 2006) ("Likewise, while Lockheed's remedial

measures ... fall under the statute's definition of 'loss,' such measures do not fit in the definition of 'damage,' which is aimed at the impairment rendered to the computer and information therein."). The Court agrees with Defendants that Plaintiffs have failed to explain how Defendants' improper and unauthorized access of privileged attorney-client communications would have any possible impact on a patient's treatment or care. In fact, such allegations would appear attenuated and nonsensical.

Plaintiffs also argue that they have suffered a "loss" of $5,000 within the meaning of the CFAA because Plaintiffs were forced to conduct a damage assessment and pursue legal action to preserve the confidential and privileged status of the information wrongly obtained by the Hospital (D.E. 19 ¶ 60). Plaintiffs argue that they are not asserting that their legal fees in prosecuting this action constitutes a loss under the CFAA; rather, Plaintiffs' "loss" is the legal fees expended in a related state action through motion practice and discovery to ensure that the attorney-client privileged status of the e-mails that the Hospital improperly obtained from Plaintiffs' computers was preserved. Plaintiffs insist that they are not required to itemize its alleged losses at the pleading stage.

A civil action under the CFAA may only be brought if it involves a loss aggregating at least $5,000 in value. *See* 18 U.S.C. § 1030(g). Under the CFAA, loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of <u>interruption of service</u>." 18 U.S.C. § 1030(e)(11) (emphasis added).

Plaintiffs' have failed to plead that any loss incurred was due to the "interruption of service." Plaintiffs' argue that their "loss" was the amount of legal fees that were allegedly incurred in responding to the CFAA violation in the state court proceeding. Specifically, Plaintiffs contend that they were required to engage in motion practice in the state court proceeding to protect their proprietary information that was allegedly improperly accessed. However, there is no allegation, and in fact, the Court disputes that Plaintiff can allege a violation that any such loss was due to the "interruption of service" under these facts alleged in the Amended Complaint. As a court in the Southern District of Florida concluded in *Continental Group, Inc. v KW Property Management, LLC*, 622 F.Supp.2d 1357, 1371 (S.D. Fla. 2009), "all loss must be as a result of 'interruption of service.' Otherwise, it would appear that the second half of the 'loss' definition is surplusage."

Accordingly, the Court finds, based upon the allegations pleaded in the Amended Complaint, that the "loss" alleged does not stem from any interruption of service. This deficiency is fatal to Plaintiffs' CFAA claim and, therefore, Defendants' Motion to Dismiss Count III is GRANTED.

### 3.  Count IV:  Breach of Fiduciary Duty against Dr. Ramirez

Dr. Ramirez moves to dismiss Count IV on the grounds that Dr. Ramirez did not owe a fiduciary duty to PNASF or its partners once Dr. Ramirez was disassociated from PNASF. Dr. Ramirez argues, based upon the allegations in the First Amended Complaint, that he was already disassociated from PNASF at the time he allegedly breach his fiduciary duty by posting job openings for pediatric nephrologists in October 2015. In addition, Dr. Ramirez argues that Plaintiffs have failed

to allege specific details regarding when Dr. Ramirez recruited new doctors, stole patients and referrals, or spied on patients' medical records.

In response, Plaintiffs argue that they have alleged conduct by Dr. Ramirez that demonstrates Dr. Ramirez was actively competing with and undermining Plaintiffs, while still in the partnership, by establishing a pediatric nephrology practice, actively recruiting new doctors to join that practice and compete with PNASF, and by stealing referrals from PNASF. D.E. 19 ¶ 68. Plaintiffs contend that this conduct extends beyond mere preparatory action. In addition, Plaintiffs argue that the cases cited by Defendants are inapposite because they address an employee's duty of loyalty to an employer, and here, Dr. Ramirez was a partner in the partnership, where the duties owed are greater than those an employer owes its employee.

▮ Under Florida law, a claim for breach of fiduciary duty requires a plaintiff to allege (1) an existing fiduciary duty, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Silver v. Countrywide Home Loans, Inc.*, 760 F.Supp.2d 1330, 1338 (S.D. Fla. 2011) (citing *Gracey v. Eaker*, 837 So.2d 348 (Fla. 2002)). In addition, "a fiduciary relationship exists where confidence is reposed by one part and a trust accepted by the other." *Silver*, 760 F.Supp.2d at 1338 (citing *Doe v. Evans*, 814 So.2d 370, 374 (Fla. 2002)).

▮ In their First Amended Complaint, Plaintiffs allege that Dr. Ramirez breached his fiduciary duty to the PNASF and to his partners, Dr. Cepero and Dr. Paredes, by recruiting new doctors to compete directly against his partnership, by stealing patients and referrals from his partners, by spying on the medical records of his partners' patients, and by conspiring with the Hospital. D.E. 19 ¶¶ 66–69. Plaintiffs further allege that upon learning of Dr. Ra-

mirez's breaches of his fiduciary duty, Dr. Cepero and Dr. Paredes gave notice to Dr. Ramirez that he had been disassociated from the partnership due to his misconduct. *Id.* ¶ 29.

For similar reasons addressed in dismissing Count II, the Court finds that Plaintiffs have failed to clearly identify Dr. Ramirez's conduct that took place prior to and subsequent to his disassociation from PNASF. Such allegations are crucial to Plaintiffs' claim for breach of fiduciary duty. Assuming Plaintiffs can allege that Dr. Ramirez's disloyal and otherwise wrongful conduct occurred while he was in partnership with Plaintiffs and owed them a fiduciary duty, the Court would be satisfied that the claim could survive. The conduct as alleged then would extend beyond the mere preparation to open a competing business, contrary to the facts of *Fish v. Adams*, 401 So.2d 843, 845 (Fla. 5th DCA 1981).

In moving to dismiss Count IV, Defendants also argue that Plaintiffs have failed to plead additional facts to support their allegations that Dr. Ramirez stole Dr. Cepero and Dr. Paredes' patients and referrals, and spied on their patients' medical records in violation of HIPAA. D.E. 19 ¶ 68. However, such allegations meet the Rule 8 pleading requirement and are sufficient to survive Defendants' Motion to Dismiss. Accordingly, Defendants' Motion to Dismiss Count IV is GRANTED and Count IV is DISMISSED WITHOUT PREJUDICE. Because Count V (aiding and abetting breach of fiduciary duty) is dependent upon Plaintiffs' pleading of Count IV, the Court finds that Count V is also DISMISSED WITHOUT PREJUDICE.

### 4. Count VI: Conspiracy against the Hospital Defendants

The Hospital Defendants argue that Count VI should be dismissed because

Plaintiffs fail to sufficiently allege facts showing the existence of the claimed conspiracy, and further argue that the Defendants are a single entity such that there is not a combination of separate economic groups or forces. D.E. 27. Defendants argue that because they are officers, agents, and employees of the Hospital and/or PSA, there is no combination of separate economic groups or forces at issue.

■ In response, Plaintiffs argue that they have sufficiently alleged each element of a conspiracy claim, and, in particular, that they have alleges that Dr. Ramirez, while a member of the conspiracy, was acting to advance his own independent financial interest by suing Dr. Cepero and Dr. Paredes in a separate legal action related to their partnership. D.E. 19 ¶ 78. Plaintiffs acknowledge that a corporation cannot conspire with its employees or directors; however, Plaintiffs point to the exception that exists under Florida law when the individual has an "independent personal stake, apart from that of the corporation, in achieving the object of the conspiracy." *Greenberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*, 629 So.2d 252, 256 (Fla. 3d DCA 1993).

■ Under Florida law, the essential elements of an independent conspiracy claim are "a malicious motive and coercion through numbers of economic influence." *Churruca v. Miami Jai–Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977) (citing *Hunter Lyon, Inc. v. Walker*, 152 Fla. 61, 11 So.2d 176 (1942)). "[I]f the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess, then conspiracy itself becomes an independent tort." *Id.* "This independent tort of conspiracy has been labeled an economic boycott." *Hager v. Venice Hosp., Inc.*, 944 F.Supp. 1530 (M.D. Fla. 1996) (citing *Amer. Diversified Ins. Servs., Inc.*

*v. Union Fidelity Life Ins. Co.*, 439 So.2d 904, 906 (Fla. 2d DCA 1983)).

■ In their Amended Complaint, Plaintiffs allege that the Hospital, PSA, Dr. Kini, Dr. Feld, and Dr. Ramirez participated in a conspiracy to use their combined power in the marketplace to damage Plaintiffs' medical practice. D.E. 19. ¶¶ 76–79. The Court finds that Plaintiffs have sufficiently alleged a conspiracy claim under Florida law. For similar reasons addressed in the Court's analysis of Count II, the Court finds that Plaintiffs have alleged that Dr. Ramirez was acting to advance his own independent financial interest in participating in the conspiracy to gain an advantage over Dr. Cepero and Dr. Paredes in a separate legal action. D.E. 19 ¶ 78. Accordingly, Defendants' Motion to Dismiss Count VI is DENIED.

### 5. Count VII: Tortious Interference with Advantageous Professional Relationship against the Hospital and PSA

The Hospital and PSA move to dismiss Count VII because Plaintiffs failed to identify any information regarding who the independent physicians are, or when the tortious interference began. In response, Plaintiffs argue that they are not required to identify the specific customers or business relationships at issue to adequately state a claim for tortious interference with an advantageous business relationship under Florida law. Further, Plaintiffs argue that they are not required to specifically plead a "time frame" under existing case law; but nonetheless, the Amended Complaint makes clear that the relevant misconduct occurred throughout 2015.

■ Under Florida law, a plaintiff must establish the following five elements to state a claim for tortious interference with an advantageous business relationship: (1) the existence of a business rela-

tionship under which the claimant has rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship; (4) by a third party; and (5) damage to the claimant cause by the interference. *Rudnick v. Sears, Roebuck & Co.*, 358 F.Supp.2d 1201 (S.D. Fla. 2005) (citing *Future Tech Int'l, Ltd. v. Tae II Media, Ltd.*, 944 F.Supp. 1538, 1569 (S.D. Fla. 1996)).

██ The Court agrees with Plaintiffs that they have sufficiently stated a plausible claim for tortious interference with advantageous professional relationships. The Court is unaware of any case law that would require Plaintiffs to specifically allege the identity of the patients and/or independent physicians at this stage. The cases cited by Defendants are distinguishable from the facts of this case as the complaints in those cases do not specifically identify the business relationships that are at issue. Here, Plaintiffs have identified that the business relationships at issue are Dr. Cepero and Dr. Paredes' professional relationships with other doctors practicing at the Hospital. D.E. 19 ¶ 81. Plaintiffs are not required to plead additional factual allegations to survive Defendants' Motion to Dismiss.

### 6. Count IX: Breach of Contract against the Hospital

The Hospital moves to dismiss Count IX on the grounds that the Hospital did not breach the contract because as of January 1, 2016 because PNASF no longer employed a physician and, per the terms of the Agreement, "[it] shall immediately terminate in the event [PNASF no longer employs a physician." According to the Hospital, it was entitled to terminate the Agreement because at the time of the termination Dr. Paredes and Dr. Cepero had been hired as employees of Kidz Medical, "to perform such duties and work which is consistent with Employee's specialty as set

forth herein[.]" *See* D.E. 15, Ex. 1, Ex. A ¶ 3.1.

In response, Plaintiffs argue that the Hospital simply assumes—without any factual or legal basis—that PNASF no longer employed any physicians at the time of the termination. (D.E. 27 at 17–28) However, according to Plaintiffs, this is factually inaccurate and relies on facts beyond the four corners of the Complaint.

██ To plead a breach of contract claim under Florida law, a plaintiff must assert the existence of a contract, a breach of such contract, and damages resulting from such breach. *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F.Supp.2d 1355, 1365 (M.D. Fla. 2007).

██ In moving to dismiss Count IX, Defendants request that this Court accept Defendants' representations as fact. But, based upon Plaintiffs' well-pleaded allegations, PNASF entered into a three-year contract with the Hospital on January 1, 2016, under which the PNASF partners provided teaching services at the Hospital, D.E. 19 ¶ 94, which contract the Hospital breached by terminating PNASF without cause. *Id.* ¶ 97. These allegations are sufficient to state a claim for breach of contract claim under Florida law. Accordingly, it is hereby

ORDERED AND ADJUDGED that Defendants' Partial Motion to Dismiss or for More Definite Statement of Plaintiff's First Amended Complaint (D.E. 27) is GRANTED IN PART AND DENIED IN PART. Defendants' Motion to Dismiss Counts II, III, IV, and V is GRANTED. Counts II, IV, and V are DISMISSED WITHOUT PREJUDICE. Count III is DISMISSED WITH PREJUDICE. It is further

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss Counts VI, VII, and IX is DENIED. It is further

ORDERED AND ADJUDGED that Plaintiffs are granted leave to amend their Complaint, if they so wish, to correct the deficiencies addressed in this Order by **Friday, January 16, 2017**. Defendants SHALL file their response to Plaintiffs' Second Amended Complaint on or before **Friday, January 27, 2017**.

DONE AND ORDERED in Chambers at Miami, Florida, this 28th day of December, 2016.